**THE IDAHO STATESMAN, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Boise Typographical Union No. 271, Intervenor.**

**No. 86–1539.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 17, 1987.

Decided Jan. 22, 1988.

John B. Jaske, with whom Joyce T. Bailey was on the brief, for petitioner.

Laurence S. Zakson, Atty., N.L.R.B., for respondent. Elliott Moore, Deputy Associate General Counsel, N.L.R.B., Washington, D.C., was on the brief, for respondent.

Richard Rosenblatt was on the brief, for intervenor, Boise Typographical Union No. 271.

Before SILBERMAN, D.H. GINSBURG and KOZINSKI,* Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

The Idaho Statesman ("the Company") has petitioned this court for review of a National Labor Relations Board decision and order finding that the Company violated sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (5) (1982). The Board found that the Company, in its negotiations with Boise Typographical Union No. 271 ("the Union"), twice insisted to impasse on changing the scope of the collective bargaining unit represented by the Union, and thereafter unilaterally implemented its impasse proposals. First the Company insist-

* Of the United States Court of Appeals for the Ninth Circuit, sitting by designation pursuant to 28 U.S.C. § 291(a).

ed on changing two related provisions in the existing bargaining agreement: the description of mail room jobs to be performed by union members and the classification of mail room employees. After bargaining to impasse, the Company implemented these changes. Later, the Company reopened negotiations with the Union, made another proposal regarding classification, again reached impasse, and again implemented its proposal. As we explain more fully below, we find that the Board erred in concluding that the portion of the Company's first proposal concerning the description of mail room jobs involved bargaining unit issues; as a result, the Company's insistence to impasse on including that term in a new collective bargaining agreement was proper. We nonetheless agree with the Board that the Company's insistence (twice) on reclassifying certain categories of workers unlawfully conditioned the consummation of a collective bargaining agreement on bargaining unit issues over which the Union was not legally obligated to bargain with the Company. We therefore deny the Company's petition for review and grant the Board's cross-application for enforcement.

## I

The Company publishes a newspaper of general circulation in Boise, Idaho. For at least seventy-five years it has voluntarily maintained a collective bargaining relationship with the Union. The Union represents employees who perform designated assignments in the Company's composing and mail rooms. In this case, we are concerned solely with the Union's representation of mail room employees.

In 1977, collective bargaining between the Company and the Union resulted in an agreement containing both a "recognition" clause and a "jurisdiction" clause. The recognition clause described the workers to be represented by the Union—the bargaining unit—as "all employees covered by" the collective bargaining agreement. "Employees" were defined in the clause as "journeymen and apprentices." Joint Appendix ("J.A.") at 20, 23. The jurisdiction clause detailed the work assignments to be performed by journeymen and apprentices.[1] With respect to the mail room, the clause generally described these assignments as "all mailing room work," but this imprecise description was clarified by a long list of more specific tasks. In addition, "all work pertaining to the mailers' trade on the loading platforms" was included in the enumeration. *Id.* at 22. Thus, "mailing room work," as the list of tasks made clear, was not limited to assignments performed within the physical boundaries of the mail room.

The Union's jurisdiction over mail room work was not exclusive. The 1977 agreement recognized that "other persons" not classified as journeymen or apprentices—and thus, not "employees" within the meaning of the recognition clause—could perform tasks also performed by Union members. Specifically, the Company and the Union agreed that these non-union workers could perform "hand stuffing and hand inserting," tasks that consisted largely of placing advertising supplements into newspapers. The wages and conditions of employment applicable to these workers were not established by the agreement. *Id.* at 22.

In 1981, the Company and the Union entered into a new agreement that, like the 1977 agreement, contained a recognition clause and a jurisdiction clause. The rec-

---

1. In keeping with custom and Board usage, this opinion describes the specific jobs that a particular bargaining agreement has assigned, at least in part, to employees represented by a union as the union's "jurisdiction." *See, e.g., Boeing Co.,* 230 N.L.R.B. 696, 701 (1972), *enforcement denied,* 581 F.2d 793 (9th Cir.1978); *Columbia Tribune Publishing Co.,* 201 N.L.R.B. 538, 545 (1973), *enforced,* 495 F.2d 1384 (8th Cir.1974); *see also Newspaper Printing Corp. v. N.L.R.B.,* 692 F.2d 615, 619 (6th Cir.1982) ("Jurisdictional clauses concern the assignment of work to union members...."). Although the concept of an "appropriate bargaining unit" may also be defined with reference to specific jobs or job classifications, it is analytically, if not factually, distinct from the concept of jurisdiction. Specifically, an appropriate bargaining unit is more precisely an electoral unit; it demarcates those employees or classes of employees that form a union's constituency. *See generally* R. GORMAN, BASIC TEXT ON LABOR LAW 66 (1976).

ognition clause was identical to that of the earlier agreement. To the extent that the jurisdiction clause described the work assignments of journeymen and apprentices, it too was identical to the jurisdiction clause contained in the 1977 agreement. The 1981 and the 1977 jurisdiction clauses differed, however, in one significant way: the 1981 agreement recognized two new classes of mail room workers—"A Trainees" and "B Trainees." A Trainees were "recognized as being within the mail room bargaining unit," *id.* at 24, and the Company and the Union both agree that the Union represented these workers. Brief of Petitioner at 33; Brief of Intervenor at 3. The A Trainees essentially performed all the assignments performed by journeymen, with the exception of certain maintenance and supervisory functions. The A Trainees were considered by the Union as the equivalent of apprentices.

B Trainees were described as "other persons employed by the Employer not classified as journeymen, apprentices or 'A' Trainees ... presently doing work hand stuffing in the mail room." J.A. at 25. Unlike the A Trainees, however, the B Trainees were "not covered by any other provisions" of the agreement; "[t]heir wages and other conditions of employment [were to be] established by company policy." *Id.* at 26. The B Trainees performed assignments that were also performed by Union members, but the B Trainees' assignments were more limited than those of the A Trainees.

In the fall of 1984, the Company and the Union entered into negotiations for a new collective bargaining agreement. The Company proposed to recognize the Union, as it had in previous agreements, "as the exclusive bargaining representative of all employees covered by" the proposed agreement; "employees" would again be defined as journeymen and apprentices. *Id.* at 82. The Company also, however, proposed two changes that prompted this litigation.

The first of the proposed changes concerned the description of assignments included in the Union's jurisdiction over mail room work. Rather than referring to "all

mailing room work," as did the past agreements, the proposal put forward by the Company described the Union's jurisdiction as "[a]ll mailing room work performed in the mailing room." *Id.* at 99. The Company's second proposed change eliminated the A Trainee and B Trainee classifications; in their stead the Company proposed a single classification of employees to be denominated "Helpers." This proposal read as follows:

*Mail Room Helpers*

Section 2. Other persons employed by the Employer not classified as Journeymen or apprentices and previously referred to as "B" trainees are presently doing work in the mail room. This practice may continue.

Mail room helpers under the direction of the office, may perform bargaining unit work.

They shall not be covered by any other provisions of this contract. Their wages and other conditions of employment shall be established by company policy.

*Id.* at 100.

Between August 1984 and February 1985 the Company and Union met and negotiated approximately twenty times, but a collective bargaining agreement was not consummated. The Union refused to agree to the two changes discussed above, and the Company was resolute that they be included in any collective bargaining agreement. In early February 1985, after the Union members voted to reject the Company's final offer, the Company implemented that proposal, including the changes discussed above. As a result, A Trainees were paid lower hourly wages and worked fewer hours. On February 11, the Union filed unfair labor practices charges with the NLRB's regional office.

On August 28, 1985, the Company wrote to the Union in response to an arbitration decision involving an issue not presently before the court. Pursuant to the Company's continuing obligation to bargain with the Union, the Company proposed certain changes relating to the arbitrator's decision, and at the same time suggested the

following further change in the conditions implemented unilaterally in February:

> There are no more "A" or "B" Trainees. There are Journeymen, Apprentices and Mailroom Helpers in the bargaining unit. All may perform any bargaining unit work under the direction of the office. The Mailroom Helpers shall not be covered by any other provisions of this contract. The wages and other conditions of employment of Mailroom Helpers shall be established by Company policy. Specifically, nothing shall prevent the office from scheduling a Mailroom Helper to perform work in the Mailroom rather than scheduling Journeymen and Apprentices, provided that job guaranteed Journeymen have been offered no less than five shifts per week.

*Id.* at 36.

The Union construed this proposal as "a retreat by the company" from the February conditions, J.A. at 39, and offered to enter into negotiations with the Company. The parties met four times in September and October, but an agreement remained elusive. After this impasse, the Company implemented the terms of the August 28, 1985 proposal. The Union thereafter filed additional unfair labor practices charges against the Company and the Board's Regional Director issued a complaint consolidating the February and August charges for a hearing before an administrative law judge ("ALJ").

The ALJ found that the Company had unlawfully bargained to impasse over a permissive subject of bargaining, namely the scope of the Union's representation, in both rounds of negotiations in 1985. The ALJ also ruled that by implementing the proposed changes the Company had failed to bargain in good faith. The Board adopted as its own the recommended decision and order of the ALJ without substantial modification, and the Company filed a petition for review of the Board's decision and order in this court.

## II

■ The potential topics of collective bargaining fall within three broad classifications: mandatory subjects, permissive subjects, and illegal subjects. *See generally National Labor Relations Board v. Wooster Div. of Borg–Warner Corp.*, 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958). Mandatory subjects, over which both the union and the employer are obligated to bargain in good faith, are those specified in Section 8(d) of the NLRA: "wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d). Permissive subjects fall outside the scope of Section 8(d), but may nevertheless touch and concern the relationship of the employer to the union or to the employees the union represents. Although permissive subjects are appropriate topics for negotiation between the union and the employer, an employer or a union commits an unfair labor practice by conditioning the consummation of a collective bargaining agreement upon the inclusion of a term covering a permissive subject of bargaining. The Supreme Court has reasoned that "such conduct is, in substance, a refusal to bargain about the subjects that are within the scope of mandatory bargaining." *Borg–Warner*, 356 U.S. at 349, 78 S.Ct. at 723. Illegal subjects are simply those proscribed by federal or, where appropriately applied, state law.

■ The scope of the bargaining unit represented by a union is a permissive subject of bargaining, *Newspaper Printing Corp. v. NLRB*, 692 F.2d 615, 620 (6th Cir.1982); *Newport News Shipbuilding & Dry Dock Co. v. NLRB*, 602 F.2d 73, 76 (4th Cir.1979); *Hess Oil & Chemical Corp. v. NLRB*, 415 F.2d 440, 445 (5th Cir.1969); regardless whether the recognized unit has been certified by the Board pursuant to the procedures of § 9 of the NLRA, 29 U.S.C. § 159, or as is the case here, the unit has been voluntarily agreed upon by the employer and the union. *See Newspaper Printing Corp. v. NLRB*, 625 F.2d 956, 963 (10th Cir.1980). If it were a mandatory subject, an employer could use its bargaining power to restrict (or extend) the scope of union representation in derogation of employees' guaranteed right to representa-

tives of their own choosing.[2]

In this case we must determine whether the Company's impasse proposals unlawfully conditioned the consummation of a collective bargaining agreement upon a change in the scope of the bargaining unit. We are mindful that this determination is one that the Congress has assigned in the first instance to the Board. Its findings of fact must be upheld if they are supported by substantial evidence on the record as a whole. 29 U.S.C. § 160(f); *see Local Union 1395, Int'l Brotherhood of Electrical Workers v. NLRB*, 797 F.2d 1027, 1030 (D.C.Cir.1986). Under the "substantial evidence" standard, "[a] reviewing court may not 'displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*'" *International Ladies' Garment Workers' Union v. NLRB*, 463 F.2d 907, 919 (D.C.Cir.1972) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951)). To the extent that the Board interprets a past agreement or an impasse proposal, however, and bases its findings on such interpretations, those findings are properly regarded as "ultimate legal conclusion[s] attached to the parties' words and conduct," and are not entitled to special deference from this court. *Local Union 1395*, 797 F.2d at 1030; *see Retail*

*Clerks Int'l Ass'n, Local 455 v. NLRB*, 510 F.2d 802, 805 (D.C.Cir.1975). With these principles in mind, we turn to the terms proposed, and then unilaterally implemented, by the Company.

The Board concluded that the Company's February 1985 impasse proposal changed the scope of the bargaining unit in two ways: first, the proposal's description of mail room work within the Union's jurisdiction excluded work assignments previously performed by union-represented employees; second, by cumulating the A and B Trainees into the single classification of Helpers, the proposal deprived the former A Trainees of their right to union representation.

### A

The Board concluded that the change from "all mailing room work," the language found in the 1981 agreement, to "all mailing room work performed in the mailing room," the language of the impasse proposal, restricted the scope of the bargaining unit represented by the Union under the 1981 agreement. The Company, however, insists that the proposal was merely an attempt to foreclose any prospective application of the jurisdiction clause to work that arguably fell within its terms, but was not then, nor ever had been, performed by union members.[3] In the al-

---

**2.** Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" in Section 7 of the NLRA. 29 U.S. C. § 158(a)(1). Among the rights guaranteed by Section 7 are the "right to self-organization, to form, join, or assist labor organizations, [and] to bargain collectively through representatives of their own choosing...." 29 U.S.C. § 157. Section 9(a) endows the union chosen by a majority of employees in an appropriate bargaining unit with the status of "the exclusive representative[] of all employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment...." 29 U.S.C. § 159(a).

In explaining the interplay of these provisions in the case of an employer's insistence to impasse upon changing the scope of the bargaining unit, the Court of Appeals for the Fourth Circuit has noted:

It is well settled that insistence on a change in the scope of the unit certified by the Board

violates § 8(a)(5) of the Act. This is so because § 8(a)(5) makes it unlawful for an employer to refuse to bargain collectively with the representatives of his employees and § 9(a) provides that the representatives elected by the majority of the employees in the unit found to be appropriate by the Board ... shall be the exclusive representatives of *all* the employees in the unit.

*Newport News Shipbuilding & Dry Dock Co. v. NLRB*, 602 F.2d 73, 76 (4th Cir.1979) (emphasis in original).

**3.** Specifically, the Company argues that the clause was intended to exclude from the Union's jurisdiction work performed on computers in the business office and to prevent automatic extension of the Union's jurisdiction to mail room work performed in any satellite plant that the Company might in the future decide to build. The Company's production director, Tom Brandon, testified that the business office computers were capable of producing mail room labels, and as a result, that work might be

ternative, the Company argues that because its "mailing room work" proposal concerned the union's jurisdiction, its insistence on and subsequent implementation of the impasse proposal was unquestionably lawful, even if it did effect a change in the jobs assigned to union members. The Company's implicit premise is that jurisdictional issues are mandatory subjects of collective bargaining under any circumstances; consequently, an employer may implement changes it proposes in a union's jurisdiction so long as it first bargains in good faith to an impasse with the union.

If, as is not uncommon, the bargaining unit is described with reference to the union's jurisdiction, *see e.g., Newspaper Printing Corp.*, 692 F.2d at 617–18; *Newspaper Printing Corp. v. NLRB*, 625 F.2d at 959; *see also* R. GORMAN, BASIC TEXT ON LABOR LAW 66 (1976), the close correspondence between the composition of the bargaining unit and the specific jobs it performs makes it likely that a change in the unit's functions will have a concomitant effect on the scope of that unit. Indeed, the Board takes the position that when the bargaining unit is defined with reference to specific jobs, *any* attempt by the employer to condition the consummation of a bargaining agreement on a change in the Union's jurisdictional work will be regarded as an attempt to alter the bargaining unit and thus violates the duty to bargain in good faith. *See Newspaper Printing Corp.*, 250 N.L.R.B. (1980), *enforcement denied*, 692 F.2d 615 (6th Cir. 1982).

■ We find it unnecessary to determine whether the sharp distinction between jur-

isdictional issues and bargaining unit issues urged upon us by the Company can be applied meaningfully in this case, however. *Cf. Newspaper Printing Corp.*, 692 F.2d at 622 (6th Cir.1982); *Boeing Co. v. NLRB*, 581 F.2d 793, 796 (9th Cir.1978). For even if we accept the Board's position—that when the bargaining unit is defined with reference to specific jobs (as is the case here), any change in the union's jurisdiction necessarily constitutes a change in the bargaining unit—the evidence upon which the Board relied does not establish that the Company's impasse proposal worked a change in the Union's jurisdiction.

Apart from the text of the proposal, that evidence consists of the testimony of H. Frederick Liebenau, former president of the Union. Liebenau testified that a "good portion" of the work performed by Union-represented employees under the 1981 agreement occurred outside the four walls of the mail room. That work, according to Liebenau, consisted of "moving skids," "unloading of trucks," and some work on the loading dock. He further testified that, under the terms of the impasse proposal, this work would no longer be performed by union members. While Liebenau's testimony indicated that the Company's impasse proposal would work a change in the status quo, affecting the extent of the work presently performed by the Union, the testimony was not based on any observation of working arrangements after the impasse proposal had been implemented; rather, his understanding of the putative effect of the proposal was based solely on the language employed.[4] Nonetheless, relying exclusive-

---

claimed by the Union under the language of the 1981 agreement. Brandon further testified that although he recognized that the Company would have to negotiate with the Union regarding its jurisdiction over mail room work in any future satellite plant, the Company did not want to enter into an agreement the terms of which would automatically accomplish that extension. J.A. at 149–51.

It is undisputed that, at the time these proposals were made, the Union had not claimed jurisdiction over work performed in the business office and that the Company was not engaging in mail room work at any place other than its primary production plant. On the contrary, the

Company had solicited bids to enlarge that plant, which would almost double the size of the mail room. Brandon acknowledged that the enlarged mail room would remain under the Union's jurisdiction. *Id.* at 150.

4. The ALJ cited and credited the following testimony of Liebenau:

Q: Also, previously, the Judge asked you about the language restricting you to the so-called four-wall concept, as opposed to wherever the employer did that particular work. Was there any actual work that the employer was performing outside the mail room prior to this most recent agreement?
A: Yes.

ly on this testimony to gloss the language of the proposal, the ALJ concluded that the Company's "attempt to change mailroom work to the four corners of the mailroom, in the context of this case, relates to the description or scope of the unit, in the collective bargaining agreement, and is a permissive subject of bargaining." *The Idaho Statesman*, 281 N.L.R.B. No. 41, at 10 (Aug. 29, 1986) (citing *Newspaper Printing Corp. v. NLRB*, 625 F.2d at 963). The Board adopted this determination without modification.

The very terms of the proposal directly refute Liebenau's testimony, and *a fortiori*, the Board's conclusion, that a "good portion" of the work previously performed by the Union would be removed from its jurisdiction by the effects of the proposal. While the language of the proposal is arguably at war with itself, in that the opening clause seems to limit mail room work to that "performed in the mailing room," there can be no doubt that something more is intended since the proposal goes on to specify that such work also includes

> delivering papers to mailers, carriers, agents, truckers or newsboys in the mailing room *or delivery room*; ... conveying of newspapers, newspaper supplements, magazines or periodicals by trucks, skids or lift truck *anywhere in the plant and on the loading platforms*; [and] all work pertaining to the mailers' trade *on the loading platforms*, including the loading or unloading *to and from the tailgate of the trucks* of all incoming and outgoing periodicals...."

*Id.* at 27. Thus, the evidence cited by the Board suggests that the actual jurisdiction of the Union under the 1981 agreement remained unchanged by the impasse proposals. It therefore follows, under the

Board's reasoning, that the change did not alter the scope of the bargaining unit. *See Newspaper Printing Corp.*, 692 F.2d at 620.

The Company cannot be condemned for insisting on preventing an automatic expansion of the Union's jurisdiction, (for example, to the business office, *see supra* note 3), when there is no indication that in doing so, the Company's proposal also had some effect on the scope of the bargaining unit it had previously recognized. We thus hold that the change from "all mailing room work" to "all mailing room work performed in the mailing room" involved a mandatory subject of bargaining. As such, the Company could insist on the change to impasse, so long as it bargained in good faith and without anti-union animus.

**B**

We affirm the Board's conclusion that the Company's insistence on abolishing the classifications A Trainees and B Trainees in favor of a single classification of Helpers violated the Act. The Board found that under the 1981 agreement, the A Trainees were represented by the Union, but the B Trainees were not. The February impasse proposal combined these two classifications, removing the A Trainees from the bargaining unit and relegating them, along with the B Trainees, to the status of Helpers, who the Board found are not represented by the Union. Alternatively, the Board concluded that "[i]f [the Company] was not restricting the unit as to the 'A' trainees, it was attempting to expand the unit as to the 'B' trainees who were not part of the prior unit, but are now permitted to perform unit work." *The Idaho*

---

Q: Was it a lot or just a little?
A: A good portion of the work.
Q: What was being performed outside the mail room?
A: The moving of skids with either an electronic lift truck, dolly, electronic hand dolly, unloading of trucks when skids arrived from outside the plant, some dock work. I'm not all familiar with all of the work that was done. I believe most of the mail itself, as far as being mailed out, is done within the mail room. I don't really know how far that goes

past the dock, as far as the mailers are concerned, the journeymen mailers.
Q: And the language in the expired contract covered all the work that you were just speaking of?
A: Yes. Correct.
Q: Their proposed language would not have covered that work?
A: Not the way it was read, the way it was worded.
*The Idaho Statesman*, 281 N.L.R.B. No. 41, at 9–10 (Aug. 29, 1986).

*Statesman,* 281 N.L.R.B. No. 41, at 1 n. 2. These conclusions are fully supported in the record—both by the terms of the 1981 agreement and of the February and August proposals, and by the findings of the Board, for which there is substantial evidence, regarding the conduct of the Union and of the Company.

The Company argues that the effect of creating the Helper classification was merely to elevate all former B Trainees to a status equal to that of the former A Trainees. So construed, the impasse proposal merely extinguished any worker classification equivalent to that of the former B Trainees, and brought more employees within the bargaining unit described and established by the 1981 agreement. The only evidence that even remotely supports this interpretation is the testimony of the Company's production director, Tom Brandon.[5] The Board refused to credit this testimony for three reasons. First, the Board noted that the testimony was in conflict with the language of the proposal, which it construed as conferring on the Company unilateral control over the former A Trainees' wages and conditions of employment. Second, the Board noted that the language of the proposal describing the Helpers was nearly identical to that used to describe the B Trainees under the 1981 agreement, and that the Company had never bargained with the Union about their wages and conditions of employment. Finally, the Board found that the Company's interpretation was not conveyed to the Union during bargaining. *Id.* at 11.

As we noted in Part I, *supra,* the 1981 recognition clause described the bargaining unit as "all employees covered by" the agreement and defined "employees" as "journeymen and apprentices." Although the A Trainees were not journeymen or apprentices, the agreement explicitly stated that A Trainees are "a new classification of employee *recognized as being employed within the mail room bargaining unit.*" J.A. at 24 (emphasis added). Neither the Company, nor the Union, nor the Board contends that the A Trainees were not represented by the Union under the 1981 agreement. The B Trainees were not journeymen or apprentices, nor were they expressly included in the bargaining unit under the 1981 agreement. Their status most closely resembled that of the casual laborers previously employed by the Company and referred to in the 1977 agreement as "other persons." The B Trainees' wages and conditions of employment, in the words of the 1981 agreement, were to be "established by company policy." *Id.* at 26.

While the 1981 agreement itself is not utterly conclusive on the point, the record supports the Board's finding that the A Trainees were, and the B Trainees were not, part of the bargaining unit. Testimony by the Company's production director indicated that in setting "company policy" with respect to the B Trainees' terms of employment, the Company never bargained with the Union. *Id.* at 164. Other testimony indicated that the Union never regarded the B Trainees as being included in the bargaining unit. *Id.* at 131. Thus, in light of the parties conduct, it is apparent that the 1981 agreement simply memorialized the parties' understanding that the Union's jurisdiction over mail room work was not exclusive. The B Trainee provision was most likely an attempt to prevent any prospective dispute between the Company and

---

5. The Company also points to testimony by a former A Trainee indicating that as a Helper she performed the same tasks she had performed as an A Trainee. *See* J.A. at 72–73. From this evidence, the Company argues that the Helper classification was equal to the A Trainee classification. We do not believe that this evidence leads to the suggested conclusion. That Helpers who were former A Trainees were performing their old tasks lends no logical support to the argument that the Helpers who were former B Trainees are now the equals of the A Trainees. There is no evidence that Helpers who were

formerly B Trainees received the training needed to perform A Trainee work or otherwise performed any work other than that which they had performed as B Trainees.

The Company also argues that it in fact recognized the Union as the representative of the Helpers by processing their grievances through procedures established under the 1981 agreement and by negotiating over the Helpers' wages. These Company actions occurred, however, long after the February impasse, and thus bear only remotely on the relevant bargaining posture of the Company.

the Union concerning the appropriate allocation of mail room work between union-represented workers (journeymen, apprentices, and A Trainees) and non-union workers (B Trainees). In any event, references to the B Trainees and to the assignments that they were to perform were not meant to, and did not, place the B Trainees within the bargaining unit.

■ The February 1985 impasse proposal merged the A and B Trainees under the single heading of Helpers. The proposed recognition clause mirrored that of the 1981 agreement. Like the former B Trainees, the Helpers were neither journeymen or apprentices, nor were they "covered by any other provisions" of the proposal. Also like the former B Trainees, the Helpers' wages and other conditions of employment were to be "established by company policy." *Id.* at 100. Moreover, the Helpers were to be part-time employees, like the B Trainees and unlike the A Trainees.[6] Given these similarities between the Helpers in the proposal and the B Trainees under the 1981 agreement, the Board could properly conclude that the Company's purpose in including the Helpers in the impasse proposal was not to include them in the bargaining unit, but rather to exclude the A Trainees. The abolition of the separate A and B Trainee classifications therefore effectively deprived the A Trainees of their rights to Union representation.

We also agree with the Board that the Company unlawfully insisted to impasse when it reopened negotiations with its August 28, 1985 proposal. That proposal expressly indicated that the Helpers would be included in the bargaining unit. Against the bargaining history between the parties, however, it too represented a change in the scope of the bargaining unit. In 1981, the Company and the Union had agreed to a two-tiered classification of mail room work-

ers who were neither journeymen nor apprentices. One tier was included in the bargaining unit, while the other was not. By insisting on combining these classifications, the Company was necessarily changing—either by decreasing or by increasing—the identity of the employees over whose wages, hours, and other conditions of employment it was prepared to bargain with the Union. The February proposal threatened to exclude the A Trainees from Union representation they previously enjoyed; the August proposal threatened to expand the Union's representation by including workers or job classifications not within the previously recognized bargaining unit. As the Board held, unilateral implementation of both proposals violated the employer's duty to bargain with the Union in good faith.

### III

We have found that the Board erred in determining that the Company's insistence on changing the language of the jurisdiction clause from "all mailing room work" to "all mailing room work performed in the mailing room" was an attempt to change the scope of the bargaining unit. The Company could insist on such a change because it involves a mandatory, not a permissive, subject of bargaining.

We have not found any error, however, in the Board's determination that the Company's insistence on abolishing the A and B Trainee classifications in favor of a single Helper classification was an attempt to redefine the bargaining unit previously recognized by the Company. The Company thus bargained to impasse on a permissive subject of bargaining in derogation of its duty to bargain in good faith. Consequently, we will enforce the Board's order requiring the Company to bargain in good faith with the Union and to take such af-

---

6. Under the 1981 agreement, B Trainees worked 20 hours per week or less, while the A Trainees, on average, worked a 32–35 hour work week. *See* J.A. at 126. The production director testified that the helper proposal "was based on having a single group of part-time people augmenting a group of trained journeymen." *Id.* at 143. Further testimony by the production di- rector indicated that during negotiations over the proposal the Company told the Union that it would limit *all* Helpers to a work week of less than 20 hours. *Id.* at 160. Thus, the bargaining history of the Company and the Union tends to reinforce the Board's interpretation of the impasse proposal.

firmative actions as will restore all affected employees to the position they would have occupied had the Company not unilaterally implemented the terms of the Helper classification proposals.

*It is so ordered*