**HILL-ROM COMPANY, INC.,**
**Petitioner/Cross-**
**Respondent,**

**v.**

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent/Cross-**
**Petitioner.**

**Nos. 89-3721, 90-1236.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 2, 1990.
Decided March 6, 1992.

William R. Stewart, N.L.R.B., Contempt Litigation Branch, Aileen A. Armstrong, Robert I. Tendrich (argued), N.L.R.B., Appellate Court, Enforcement Litigation, Washington, D.C.

William T. Little, James S. Robles, N.L.R.B., Region 25, Indianapolis, Ind., for N.L.R.B.

Kenneth J. Yerkes, Robert K. Bellamy (argued), Barnes & Thornburg, Indianapolis, Ind., for Hill–Rom Co., Inc.

Before EASTERBROOK, MANION and KANNE, Circuit Judges.

KANNE, Circuit Judge.

To improve its quality control program, Hill–Rom Company, Inc. proposed that certain work from one of its recognized bargaining units be transferred into a new, non-unit position entitled Quality Assurance Technician ("QAT"). However, after several meetings with Hill–Rom, the union representing Hill–Rom's employees the Furniture & Casket Workers Local Union No. 525, Upholsterers International Union of North America, AFL–CIO ("Union") rejected the proposed work transfer. Notwithstanding the Union's disapproval, Hill–

Rom decided to unilaterally transfer the work to the new position, and the Union subsequently responded by filing an unfair labor practices charge with the National Labor Relations Board. Concluding that Hill–Rom's unilateral action constituted an illegal alteration of the scope of the bargaining unit, the Board found that Hill–Rom violated §§ 8(a)(5) and (1) of the National Labor Relations Act by excluding employees in the job classification of QAT from the bargaining unit without the agreement of the Union and by refusing to apply the collective bargaining agreement to those employees. The Board then entered an order requiring Hill–Rom to cease and desist this unfair labor practice. Hill–Rom petitions for review of the Board's order; the NLRB has cross-applied for enforcement of its order.

## I.

Hill–Rom, a subsidiary of Hillenbrand Industries, Inc., manufactures hospital beds as well as other architectural and furniture products for the health care industry. The hospital furniture market is a competitive one; there are only 8300 hospitals in the United States and 3000 of these hospitals control 80% of the beds. Acknowledging that it needed to improve the quality of its hospital beds in order to compete effectively with other suppliers, Hill–Rom decided to revamp its quality control system in 1983. To implement this change, Hill–Rom planned to consolidate the inspection duties of its Inspector 3 and Inspector 4 positions with additional duties under the new, non-unit classification of Quality Assurance Technician.

Hill–Rom informed the Union of its intent to change its quality assurance program by creating the new position. The parties met three times to discuss the proposed changes and their implications for bargaining unit employees. However, the Union insisted that Hill–Rom could not transfer the work to a non-unit position and no agreement was ever reached concerning these changes.

Having bargained to an impasse, Hill–Rom advised the Union that it intended to unilaterally implement the proposed change in its quality assurance program. On April 2, 1984, Hill–Rom transferred the work performed by the two inspector classifications to fourteen new QAT positions. These new positions were filled by application, and of these fourteen, twelve were filled by former inspectors. The remaining two inspectors declined to apply and were subsequently reassigned to different positions. The Inspector 3s and 4s were offered higher salaries and benefits if they applied for and were accepted as QATs. No unit employee was unilaterally removed from the bargaining unit or forced to leave it.

On April 6, 1984, the Union filed an unfair labor practices charge against Hill–Rom, alleging that the company had violated their collective bargaining agreement when it removed twelve bargaining unit positions from the Quality Assurance Department.[1] The Regional Director of the Board referred the case to arbitration, as specified by the parties' bargaining agreement, and indicated that it would defer to the arbitrator's findings. At the arbitration hearing, the arbitrator found in favor of Hill–Rom, reasoning that "the transfer of the final inspection duties to the new non-unit classification did not violate the recognition language of [their bargaining agreement]." Accordingly, because the company had bargained to impasse and harbored no anti-union animus, the arbitrator concluded that Hill–Rom's actions were reasonable and did not violate the parties' agreement.

Following this arbitration, however, the Board concluded that it would not defer to the arbitrator's decision. It then issued a complaint and notice of hearing. At the conclusion of its own hearing, the administrative law judge determined that Hill–Rom had unlawfully altered the scope of the bargaining unit. The ALJ pointed out that the new QATs spent 75% of their time doing work previously performed by unit employees, while the other 25% of the time involved new tasks including product review and laboratory work, electronic component testing, and field work. Both parties concede that these new tasks were traditionally performed by non-unit employees. The judge also specifically noted that Hill–Rom had displayed no sign of anti-union animus. Nonetheless, citing the overlap of the duties performed by the old and new positions, the Board determined that these Inspectors *cum* QATs should be considered members of the bargaining unit.

The Board affirmed the administrative judge's decision on November 21, 1989. *Hill–Rom Co., Inc.*, 297 NLRB No. 53. Following the Board's affirmance of the administrative law judge's decision, Hill–Rom filed its petition for review. The Board later cross-petitioned for enforcement of its order.

## II.

The parties in this case do not dispute what the law is, but rather contest which law should apply to this factual situation. Hill–Rom contends that its actions constituted a lawful transfer of work out of the bargaining unit, within the requirements set forth in *University of Chicago v. NLRB*, 514 F.2d 942 (7th Cir.1985). The Board, on the other hand, insists that this case constitutes an unlawful alteration of the scope of the bargaining unit as defined by *NLRB v. Bay Shipbuilding Corp.*, 721 F.2d 187 (7th Cir.1983). Therefore, we begin our analysis by reviewing the principles

---

1. Hill–Rom and the Union have been parties to a series of collective bargaining agreements. Under the "Recognition" clause of the agreement, the parties agreed that:

The Company recognizes the Union as the sole and exclusive representative for the purposes of collective bargaining in respect to rates of pay, wages, hours of work, and other working conditions, for all its production and maintenance employees, except for office and clerical employees, salesmen, truck drivers, garage mechanics, watchmen, engineers, firemen, carpenters, painters, research department employees and all supervisory employees.

The collective bargaining agreement does not include a provision specifying that certain work classifications or job titles were covered by the agreement.

underlying the subtle distinction between transferring work from a bargaining unit, and changing the scope of a bargaining unit.

■ The potential topics of collective bargaining[2] generally fall within three broad classifications: mandatory subjects, permissive subjects and illegal subjects. *See generally NLRB v. Wooster Div. of Borg–Warner Corp.*, 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958); *The Idaho Statesman v. NLRB*, 836 F.2d 1396, 1400 (D.C.Cir.1988). *See also Facet Enterprises, Inc. v. NLRB*, 907 F.2d 963, 975 (10th Cir.1990). Mandatory subjects, over which both the employer and the union are obligated to bargain in good faith, are specified in § 8(d) of the NLRA as "wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d). *See also Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 210, 85 S.Ct. 398, 402, 13 L.Ed.2d 233 (1964); *Facet Enterprises*, 907 F.2d at 975. If an employer and a union bargain in good faith over a mandatory subject but reach an impasse during their negotiations, the employer may then implement its proposal unilaterally without the union's consent. *Trustees of Col. Pipe Indus. Pension Trust v. Howard Elec. & Mechanical, Inc.*, 909 F.2d 1379, 1384 (10th Cir.1990), *cert. denied*, ── U.S. ──, 111 S.Ct. 958, 112 L.Ed.2d 1046 (1991); *Facet Enterprises*, 907 F.2d at 975 n. 2. Permissive subjects, by contrast, are those which fall outside the scope of § 8(d) and cannot be implemented by the employer without union or Board approval. *Boise Cascade Corp. v. NLRB*, 860 F.2d 471, 475–76 (D.C.Cir.1988). Illegal subjects are simply those proscribed by federal, or where appropriately applied, state law. *The Idaho Statesman*, 836 F.2d at 1400.

■ There is no doubt that the scope of the employees' bargaining unit is a permissive subject of bargaining, regardless of whether the unit has previously been certified by the Board or voluntarily agreed upon by the parties. *Newspaper Printing Corp. v. NLRB*, 625 F.2d 956, 963 (10th Cir.1980), *cert. denied*, 450 U.S. 911, 101 S.Ct. 1349, 67 L.Ed.2d 335 (1981); *The Idaho Statesman*, 836 F.2d at 1400. *See also Boise Cascade Corp.*, 860 F.2d at 474–77; *Newport News Shipbuilding & Dry Dock Co.*, 602 F.2d 73, 76 (4th Cir.1979); *Shell Oil Co.*, 194 N.L.R.B. 988, 995 (1972), *enf'd sub nom.*, *OCAW v. NLRB*, 486 F.2d 1266, 1268 (D.C.Cir.1973). Accordingly, once a specific job has been included within the scope of the bargaining unit by either Board action or consent of the parties, the employer cannot unilaterally remove or modify that position without first securing the consent of the union or the Board. *Bay Shipbuilding Corp.*, 721 F.2d at 191. *See also The Idaho Statesman*, 836 F.2d at 1400; *Hess Oil & Chemical Corp. v. NLRB*, 415 F.2d 440, 445 (5th Cir.1969), *cert. denied*, 397 U.S. 916, 90 S.Ct. 920, 25 L.Ed.2d 97 (1970). The reason why the law disfavors unilateral changes in the unit description is as simple as it is fundamental: if an employer could vary unit descriptions at will, it would have the power to sever the link between a recognizable group of employees and its union as the collective bargaining representative of these employees. "This, in turn, would have the effect both of undermining a basic tenet of union recognition in the collective bargaining context and of greatly complicating coherence in the negotiation process." *Boise Cascade Corp.*, 860 F.2d at 474–75.

■ Unlike the altering scope of a bargaining unit, a transfer of work out of a unit by an employer ordinarily constitutes a mandatory subject of bargaining. *Facet Enterprises*, 907 F.2d at 975; *Newspaper Printing Corp.*, 625 F.2d at 964. In *University of Chicago*, this court set forth the basic circumstances under which work transfers would be treated as a mandatory subject during negotiations:

[U]nless transfers are specifically prohibited by the bargaining agreement, an em-

---

**2.** Collective bargaining is defined in § 8(d) as: The performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and converse in good faith with respect to wages, hours, and other terms and conditions of employment.
29 U.S.C. § 158(d).

ployer is free to transfer work out of the bargaining unit if: (1) the employer complies with *Fibreboard Paper Products v. NLRB,* 379 U.S. 203, 85 S.Ct. 398 [13 L.Ed.2d 233] (1964) by bargaining in good faith to impasse; and (2) the employer is not motivated by anti-union animus, *Textile Workers v. Darlington Mfg. Co.,* 380 U.S. 263, 85 S.Ct. 994 [13 L.Ed.2d 827] (1965).

514 F.2d at 949. *See also Boeing Company v. NLRB,* 581 F.2d 793, 796–97 (9th Cir.1978).

■ Distinguishing between a transfer of work and an alteration in the scope of the unit, however, is not an easy task. In this appeal, Hill–Rom argues that the Board committed reversible error by accepting the ALJ's conclusion that the newly created QAT positions reflected an alteration in the scope of the bargaining unit. According to Hill–Rom, the Board had no legal grounds for interpreting its proposal as anything other than a lawful work transfer and therefore should be governed by *University of Chicago.* Hill–Rom submits that it should not have been found to violate the NLRA. We agree.

To support its argument that Hill–Rom unlawfully altered the scope of the bargaining unit, the Board repeatedly points out that 75% of the QAT work included duties which were previously performed in the former inspector classifications. In our view, however, assigning work previously performed by unit employees to other employees outside the unit is perfectly consistent with transfer of work as construed by *University of Chicago.*[3] In *University of Chicago,* the employer unilaterally transferred all janitorial work out of a bargaining unit into another unit in order to increase the efficiency of service. As a result, fourteen employees were laid off, but

twelve of the fourteen were offered and accepted the new jobs. We overruled the Board's determination that the University's proposal was an unlawful alteration in the scope of the bargaining unit, and proceeded to examine the University's conduct under the two-pronged work transfer analysis. *University of Chicago,* 514 F.2d at 948–47. Finding that the transfer was not specifically prohibited by the bargaining agreement, we concluded that the University's proposal was a legitimate work transfer since the University bargained its proposal in good faith to an impasse without reflecting any motive of anti-union animus. *Id.* at 947.

We are unable to discern any basis for distinguishing this case from the facts and holding in *University of Chicago.* In a factual scenario virtually mirroring that in *University of Chicago,* twelve of the fourteen Hill–Rom employees who were laid off applied for and accepted the QAT positions outside the unit. The Hill–Rom employees who left the unit to accept the new jobs worked in the same buildings in which they had worked before, as did the employees in *University of Chicago.* Significantly, the ALJ in this case likewise found that no provision of the collective bargaining agreement precluded Hill–Rom from transferring work out of the unit, and that Hill–Rom bargained its proposal in good faith to an impasse. The Union has never alleged, nor did the ALJ or Board ever find, that Hill–Rom was motivated by any anti-union animus. Indeed, like the University, Hill–Rom clearly established that its proposal was motivated solely by its desire to increase the efficiency in its services. In light of these noteworthy parallels, we conclude that the Board erred by not applying the principles of *University of Chicago* to the instant case.[4]

---

**3.** For other cases illustrating lawful work transfers, see *Kohler Company,* 292 N.L.R.B. No. 70 (1989) (employer's removal of stock clerk and layout work from bargaining unit are mandatory subjects of bargaining, even where reclassification has effect on bargaining unit); *Dahl Fish Company,* 279 N.L.R.B. No. 150 (1986) (decision to transfer unit work to another plant outside the bargaining unit is a mandatory subject of bargaining); *The Cincinnati Enquirer, Inc.,* 279

N.L.R.B. No. 149 (1986) (decision to transfer unit work outside the bargaining unit to a supervisory employee is a mandatory subject of bargaining).

**4.** Although it devotes little time to this issue, the Board does make an attempt to distinguish *University of Chicago* from the facts of the present case on two grounds: first, the University merely transferred work from union to another bar-

A proper application of the *University of Chicago* fully supports Hill–Rom's contention that it did not violate the NLRA: (1) no provision of the collective bargaining agreement prohibited Hill–Rom from transferring work; (2) Hill–Rom bargained its proposal in good faith to impasse; and (3) there is no allegation that Hill–Rom acted under anti-union animus. Both the ALJ and the Board determined that 25% of the work performed by the QATs was different from that performed by the two former inspector provisions, and that these new duties required substantial additional training—some of which was conducted by degreed electronic engineers. These new duties encompassed different kinds of quality assurance work, including product review and laboratory work, electronic component testing, and field work, duties which were all previously conducted by non-unit personnel. We therefore hold that Hill–Rom's implementation of the QAT program constituted a lawful transfer of work within the meaning of *University of Chicago*.[5]

### III.

For the foregoing reasons we DENY ENFORCEMENT of the National Labor Relations Board's cease and desist order against Hill–Rom Company, Inc.

EASTERBROOK, Circuit Judge, dissenting.

Hill–Rom Company, dissatisfied with the work of its inspectors, changed their duties, pay, and title. "Inspector 3" and "Inspector 4" turned into "Quality Assurance Technician." Hill–Rom wanted greater flexibility in both assignments and incentives than its collective bargaining agreement with the union allowed. Many an employer chafes under the work rules and pay structures embedded in such agreements. Employers may believe (or find it in their interest to believe) that new arrangements would be good for both labor and management but that the union resists even mutually beneficial changes. Hill–Rom reached this conclusion and put it to the test by direct bargaining. After the union balked at the proposed change, Hill–Rom made its offer directly to the employees. It described the duties and pay of a "Quality Assurance Technician"—a position that would be outside any union's jurisdiction—and invited the inspectors to apply. Twelve of the fourteen did.

There are two ways to characterize what happened. One is that the employer changed the scope of the bargaining unit. Inspectors, initially within the union's jurisdiction, have been removed from it. The other is that the employer changed the assignment of work while leaving the bargaining unit alone. Inspection work, initially assigned to employees represented by the union, has been assigned to employees who have spurned representation. These characterizations have dramatically different legal consequences. Because the scope of the unit is a "permissive" rather than "mandatory" subject of bargaining, the union has a veto (subject to override by the NLRB). By refusing to accept the employer's proposal about jurisdiction, the union

---

gaining unit represented by a different union; and, second, the case did not involve the permanent removal of an existing unit job from a union's representative scope to a newly created position which was not significantly changed, but for the lack of union representation. We fail to find support for either distinction in the case law.

**5.** The NLRB's reliance on *NLRB v. Bay Shipbuilding,* 721 F.2d 187 (7th Cir.1983) and *NLRB v. United Technologies Corp.,* 884 F.2d 1569 (2d Cir.1989) is misplaced. In both *Bay Shipbuilding* and *United Technologies* the court found substantial evidence on the record to support the NLRB's finding that the primary difference between the jobs that the employers classified as unit and non-unit was the use of technology. Otherwise, the jobs were still the same. *Bay Shipbuilding,* 721 F.2d at 190; *United Technologies,* 884 F.2d at 1573. *Bay Shipbuilding* and *United Technologies* declare that using technology to complete the same job is an insufficient basis to differentiate unit from non-unit positions. As explained above, more than technology distinguishes QATs from inspectors. Therefore, it is more appropriate to rely on the analysis in *University of Chicago,* which involved a transfer of work to employees performing a different job, than on *Bay Shipbuilding* or *United Technologies,* which involved a transfer of work to employees performing the same job using technological advances.

prevents the firm from making changes. Assignment of work, by contrast, is a mandatory subject of bargaining. After bargaining in good faith to impasse (as Hill–Rom did), an employer may put its final offer into force unilaterally.

Needless to say, the union prefers the first of the competing characterizations (change in jurisdiction) while Hill–Rom trumpets the second (change in assignment of work). The difficulty is that these often, and here, come to the same thing. Cases, including decisions by our superiors in the judicial hierarchy, establish that jurisdictional questions are permissive subjects of bargaining and that assignment disputes are mandatory subjects of bargaining. Neither the NLRB nor our court can do anything about this. Yet when the same facts can be put in either category with equal plausibility, the distinction collapses. Two things equal to the same thing are equal to each other—yet we are told by authority we cannot countermand that they are not equal.

What is to be done? When all comes down to a battle of characterization, the trier of fact must choose. Neither choice can be condemned as wrong, because in rhetorical contests of this variety there is no right or wrong. Review by the next level in the hierarchy of tribunals is correspondingly deferential. E.g., *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 110 S.Ct. 2447, 2457–61, 110 L.Ed.2d 359 (1990); *Pierce v. Underwood*, 487 U.S. 552, 557–63, 108 S.Ct. 2541, 2545–49, 101 L.Ed.2d 490 (1988); *Mucha v. King*, 792 F.2d 602, 604–06 (7th Cir.1986); *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1427–29 (7th Cir.1985). Add the deference accorded to the Labor Board's decisions—for it is to the Board, and not the courts, that Congress has delegated the resolution of labor disputes—and "what is to be done?" has a simple answer. Whichever way the Board decides, enforce its order. The Board found that "whatever differences existed between the final inspector and quality assurance technician classifications resulted from technological change and . . . the job functions remained significantly unchanged. Accordingly, the new work title

simply stood in the shoes of the old work title in the bargaining unit." That is not an inevitable understanding of the change; perhaps it is not the best understanding. But deferential review requires us to accept it.

Proceeding as if we were deciding this case *de novo,* my colleagues prefer the employer's characterization. They say that the reassignment at Hill–Rom cannot be distinguished from a reassignment of janitorial work that our court put in the "work assignment" bin. *University of Chicago v. NLRB*, 514 F.2d 942 (7th Cir.1975). It is indeed hard to distinguish our case from that one. It is even harder to distinguish our case from *NLRB v. United Technologies Corp.*, 884 F.2d 1569 (2d Cir.1989), and *NLRB v. Bay Shipbuilding Corp.*, 721 F.2d 187 (7th Cir.1983), which sifted the reassignments into the "jurisdictional change" bin. None of the three cases solves the problem; rather they define a problem for the Board to solve.

Start with *Bay Shipbuilding.* Shipwrights seek to minimize the amount of scrap created when they cut metal to make parts. The process is called "lofting." Until recently lofting was done manually. Someone built models of the parts and moved them around by hand. Today the work may be done by computer. Feed the dimensions of the parts into its memory, and the computer decides which arrangement will minimize the amount of scrap metal. Lofting by hand and lofting by computer require some skills in common but some different skills. Bay Shipbuilding established lofting by computer as a new job and gradually moved both the work and its employees from manual to electronic lofting—the latter position outside the union's domain. The Board held that this altered the union's jurisdiction in violation of the statute, and we enforced its order. It is hard to see the difference between the transfer from manual to digital lofting and the transfer from "Inspector 4" to "Quality Assurance Technician."

*United Technologies,* like *Bay Shipbuilding* and our case, presented a claim of technological change followed by reassign-

ment of work. United Technologies employed about 235 "expediters," who were supposed to know the location of vital parts in short supply and get them to production lines to prevent idle time. It also employed 76 "production inventory clerks," who maintained inventories of these parts. The union's jurisdiction included the expediters but not the clerks. United Technologies found the arrangement unsatisfactory, in part because the clerks' information could be a whole day behind. It created a new job merging attributes of the expediters' duties with the clerks' and invited both to apply. Within a short time 77 of the expediters had changed jobs. United Technologies deemed the new position outside the union's jurisdiction, but the Board held otherwise, and the court of appeals enforced that order. Any distinction between the change at Hill–Rom and the change at United Technologies is too small to perceive.

Dozens of similar cases pepper the books. The only other one I shall mention is *University of Chicago*, which holds center stage in the majority's opinion. The University of Chicago Hospitals and Clinics is a warren of buildings. Dispensaries, operating and recovery rooms, laboratories, offices, and classrooms are scattered about the complex. Until 1971 janitors working for the University's Biological Sciences Division and represented by Local 1657 cleaned the portions of the complex devoted to patients, while janitors working for the University's Plant Department and represented by Local 321 cleaned the portions devoted to offices and classrooms. An archway in a long hall might mark the transition point. Frustrated by the inefficiency entailed in the arrangement and the Plant Department's low standards of cleanliness (more suited to the Law School, where paper is the most serious contaminant), the University told the Biological Sciences Division to clean the whole complex. The Division needed extra janitors to comply, and it hired some away from the Plant Department. *University of Chicago* characterizes this as a work transfer rather than a jurisdictional shift.

My colleagues are right to think it hard to distinguish *University of Chicago* from Hill–Rom's case. But it is easier to do so than it is to distinguish *Bay Shipbuilding* or *United Technologies*. Neither Local 321 nor Local 1657 had jurisdiction of all janitorial work at the University. Before and after the transfer, each local represented some but not all of the janitors. Each union's jurisdiction was defined by reference to the component in which its employees served. Local 321's jurisdiction, for example, included "[s]ervice and maintenance classifications in the Plant Department". 514 F.2d at 946. Moving some custodial work from the Plant Department to the Biological Sciences Division did not affect that jurisdiction, although it meant that Local 321 would represent a smaller proportion of the University's phalanx of janitors. It was correspondingly hard to find a change in the jurisdiction of either local.

Contrast the recognition clause in the agreement between Hill–Rom and Local 525: "The Company recognizes the Union as the sole and exclusive representative ... for all its production and maintenance employees, except for office and clerical employees ... research department employees, and all supervisory employees." The formula "all employees except ..." is substantially more comprehensive than a formula such as "[s]ervice and maintenance classifications in the Plant Department". Hill–Rom needed to establish that the "Quality Assurance Technicians" were "research department employees"; only such a characterization would take them outside the union's representation without a change in the union's jurisdiction. Yet the employees were not shifted to "research"; they were the same inspectors as before with grandiloquent titles. So, at any rate, the Board found, and therefore we should enforce its order.