# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 21, 2016                    Decided June 10, 2016

No. 14-1252

AGGREGATE INDUSTRIES,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

Consolidated with 14-1276

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

*Richard N. Hill* argued the cause for petitioner. On the briefs was *James T. Winkler*. *Matthew T. Cecil* entered an appearance.

*Nicole Lancia*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Richard F. Griffin*, *Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Elizabeth A. Heaney*, Supervisory Attorney.

Before: WILKINS, *Circuit Judge*, and GINSBURG and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

RANDOLPH, *Senior Circuit Judge*: The evidentiary background of this case is complicated. The law is not. Aggregate Industries transferred work from one bargaining unit to another over the objections of the union representing both units. An administrative law judge found that because the company had bargained over the issue to impasse, it was entitled to make the change unilaterally. The National Labor Relations Board disagreed. *Aggregate Indus.*, 359 N.L.R.B. No. 156, at 4 (July 8, 2013) (Board opinion).[1] The Board held that the company had not merely transferred work; it had changed the scope of a bargaining unit. Therefore, Aggregate Industries had no right to insist that the union bargain over the issue. The Board also held that even if the company had merely transferred work, it had not given the union a fair chance to bargain. We disagree with both of these conclusions. We therefore grant the petition for review on that issue. We uphold the Board's decision on a collateral matter.

For the first several years of its existence, Aggregate Industries was only a construction business, and its work was

---

[1] The Board issued an order setting aside this decision after the Supreme Court held in *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014), that two of the Board's members had not been validly appointed. The Board then issued a new decision that – except for a few minor matters – incorporated the earlier decision by reference. *See Aggregate Indus.*, 361 N.L.R.B. No. 80, at 1 & n.1 (Oct. 31, 2014). We cite the vacated opinion with the understanding that it has force only to the extent the Board's later opinion incorporated it.

governed by a contract with the Teamsters union – the Construction Agreement. In 2008, Aggregate decided to "throw some money" into the Ready-Mix concrete market. The company started three cement plants in the Las Vegas area, including one near Sloan Quarry, which Aggregate owned through its construction divisions. Aggregate hired twenty or so employees in the new division and began negotiating with the Teamsters for a contract to govern the Ready-Mix work. The resulting agreement, the Ready-Mix Agreement, mostly tracked the terms of the contracts that the Teamsters had signed with other Ready-Mix companies. But it was very different from the Construction Agreement. Most importantly, the Ready-Mix Agreement paid around $25 per hour and the Construction Agreement paid around $30.

In the negotiations over the new contract, the union agreed that Aggregate could move nine drivers from the construction side of the business to the Ready-Mix division and drop their pay to the Ready-Mix rate. In their new positions, these nine employees drove oversized mining trucks in the vicinity of Sloan Quarry. But only one of the three cement plants was at the quarry, so the company still needed some way to do "material hauling" – carrying its aggregate over public roads to cement plants and construction sites. Under the union's contracts with other Ready-Mix companies, both kinds of work were done under Ready-Mix agreements and paid around $25 an hour. So the union suggested that Aggregate move more trucks, in addition to the nine, from the construction side to the Ready-Mix side. The union told the company that it could use construction drivers to do the work, because at the time, the dispatch procedure under the Ready-Mix Agreement allowed the company to pick the drivers they preferred rather than use a union-provided seniority list. The company would have to fire the drivers from the construction side of the business, but it could immediately rehire them – albeit at lower wages – to work

under the Ready-Mix Agreement. However, the union insisted that if the company transferred the trucks, the move had to be complete and permanent. After the change, the company had to change the names on the trucks and could no longer use them for construction work.

The company considered this possibility, but at the time, construction work was booming. Aggregate did not want to move trucks to the Ready-Mix division if that meant they could not do construction work part-time. Instead, the company decided to have drivers from the construction division do material hauling when they were not busy with construction, and to pay them Construction Agreement wages to do so. This was not a dramatic change; the construction unit had occasionally done material hauling work even before Aggregate started its Ready-Mix operations.[2] The company hoped to move those trucks permanently, and pay the drivers Ready-Mix wages, after the construction boom ended.

In July 2010, as two large construction projects were winding down, Aggregate decided to follow through on its earlier plan. The union's leadership had recently changed, so the company informed the new administration that it would move trucks from the construction side of the business to the Ready-Mix division to do material hauling work. Aggregate knew that this would involve firing some of its construction drivers, but it hoped to hire the same drivers again, as the previous union administration had suggested. At a meeting on July 9, the union seemed to concede that the company could transfer the material hauling work, but said that maintaining the

---

[2] Specifically, the construction drivers had sometimes hauled aggregate to construction sites, but they had never hauled aggregate to cement plants. The company had never needed to haul to cement plants until it started its Ready-Mix division.

same drivers was not an option. The new administration had changed the Ready-Mix dispatch procedures, and drivers could no longer be called up by name, only by seniority. So the company resigned itself to the fact that it would have to fire the construction drivers and then use the new dispatch procedure to rehire different drivers under the Ready-Mix Agreement.

A few weeks later, to the company's surprise, the union announced that it had a broader objection – it would not agree to transfer material hauling work after all, even if the company did not try to rehire the same drivers. At the earlier meeting, the union had apparently assumed that the old administration had signed off on the company's plan, but after considering the matter it concluded that this assumption was wrong.[3]

_____

[3] This description simplifies things a bit. Here are the details. The old administration had suggested that the company move trucks to the Ready-Mix division to do material hauling work, and the company's general counsel believed that this extended both to hauling to cement plants and hauling to construction sites. In the union's view, the previous administration had agreed to transfer trucks to haul aggregate to cement plants, but it had not agreed to transfer trucks to haul aggregate to construction sites. The union considered hauling to construction sites to be part of the work traditionally governed by the Construction Agreement, and it did not believe that the old administration would have allowed the company to transfer such work without a fight. The dispute here is only about hauling to construction sites. Although this is only a subset of material hauling work, in the end that wrinkle does not matter, so we will simply refer to hauling to construction sites as "material hauling."

Incidentally, the ALJ agreed with the union's interpretation of the old administration's agreement. We need not decide whether the ALJ was correct on this point. If the old administration had agreed to transfer hauling to construction sites, this would mean that the

Several more weeks went by, and the parties still had not reached an agreement. Finally, in late September the company made the change unilaterally and put in a dispatch order for material haul drivers under the Ready-Mix Agreement. When the union refused to fill the order, the company announced that it would exercise its contractual right to fill the jobs from other sources. Aggregate advertised the positions in the local newspaper and called a meeting of construction drivers on October 1. The company's general counsel told the drivers that Aggregate wanted to keep giving them work, but if they did material hauling, they would have to be covered by the Ready-Mix Agreement rather than the Construction Agreement. The company also offered a transition plan that gradually stepped down from the construction rate to the Ready-Mix rate. Soon afterward, the union filed the unfair labor practice charge that turned into this case, and the parties agreed to switch fifty-nine drivers from the Construction Agreement to the Ready-Mix Agreement pending the outcome of the charge. After the switch, the transferred drivers were paid Ready-Mix wages for most work. But when those drivers did part-time construction work, of which there was still a steady trickle, they were paid Construction Agreement wages.

The key question here is whether Aggregate Industries transferred work or changed the scope of the bargaining unit. Transferring work between bargaining units is a mandatory subject of bargaining, and the union would be obligated to negotiate in good faith about such a proposal. *Boise Cascade Corp. v. NLRB*, 860 F.2d 471, 474 (D.C. Cir. 1988); *see also NLRB v. Wooster Div. of Borg-Warner Corp.*, 356 U.S. 342,

---

company could make the change without bargaining at all. But the company did bargain, and it did reach impasse, so it could make the change unilaterally regardless whether the agreement with the old administration specifically allowed it to do so.

348-49 (1958). If the union refused to bargain, or if negotiations reached an impasse, then the company could make the change unilaterally. *Boise Cascade*, 860 F.2d at 474. On the other hand, changing the scope of the bargaining unit is a permissive subject of bargaining. *Idaho Statesman v. NLRB*, 836 F.2d 1396, 1400 (D.C. Cir. 1988). The parties may bargain about the issue, but neither side is compelled to do so. *Id.*; *see also Borg-Warner*, 356 U.S. at 349. If the union refuses to negotiate or if negotiations stall, the company has no choice but to maintain the status quo. A unilateral change to a permissive subject of bargaining is illegal.[4]

The ALJ found that this was a transfer of work. He noted that the complaint alleged only that Aggregate had "mov[ed] . . . delivery of materials work from the Construction Unit to the Ready-Mix Unit" and that the union had never argued that the company had eliminated the construction driver positions. 359 N.L.R.B. No. 156, at 23 (ALJ opinion). The Board reversed this

---

[4] We note that "permissive" or "nonmandatory" subjects of bargaining are not always of this mold. Sometimes these terms appear to imply quite the opposite. In some cases, the Board has used the terms to mean that a party may decline to bargain about a proposal precisely because that party has authority to decide the issue unilaterally. For example, the Board has held that the appointment of union stewards is a nonmandatory subject of bargaining in the respect that unions may appoint stewards unilaterally or may bargain that right away in exchange for other concessions. *See Torrington Indus., Inc.*, 307 N.L.R.B. 809, 818 (1992), *abrogated on other grounds by Furniture Rentors of Am., Inc. v. NLRB*, 36 F.3d 1240, 1247 (3d Cir. 1994); *see also, e.g.*, *Cote Bros. Bakery, Inc.*, 259 N.L.R.B. 776, 784 (1981) (drawing a similar conclusion about internal union discipline). The difficulty is that the terms "permissive" and "nonmandatory" imply that the parties need not bargain, but they do not determine whose position prevails in the absence of bargaining. In this case, we use the terms to mean that if one party refuses to bargain about a certain issue, both sides must maintain the status quo.

finding. It held that Aggregate Industries changed the scope of the bargaining unit because it "diminish[ed] the Construction [b]argaining unit and enlarg[ed] the Ready-Mix bargaining unit." *Id.* at 4 (Board opinion). We agree with the ALJ. We defer to the Board's conclusions if they are supported by substantial evidence, *see Boise Cascade,* 860 F.2d at 474, but when the Board reverses an ALJ on factual matters, we examine the disagreement with a gimlet eye, *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496 (1951). The Board's discretion does not give it license to rely on an oversimplified view of the facts or to "refus[e] to credit probative circumstantial evidence." *Allentown Mack Sales and Serv., Inc. v. NLRB*, 522 U.S. 359, 368 (1998).

The first step in characterizing Aggregate's action is deciding which action to characterize. The Board focused almost entirely on the final result – the fact that "as a result of the [company's] action, about 60 drivers no longer bargain" in the construction unit. 359 N.L.R.B. No. 156, at 4 (Board opinion). In the Board's view, moving that many drivers "substantially reduced the size (and bargaining power) of [the construction] unit." *Id.* But the number of drivers who ended up transferring is a red herring, and the Board was wrong to rely so heavily on it.

The company did not transfer the drivers until after the union filed its unfair labor practices charge and agreed to the transfer pending the outcome of this case. The sequence is as follows. When Aggregate made its proposal to the construction drivers by letter on October 7, 2010, it gave them until Friday, October 8, to accept the offer. Only about ten drivers did so. The following Monday, October 11, the union notified the company that the drivers were striking. Two days later the union filed its unfair labor practice charge. The day after the filing, union representative Wayne Dey talked to Sean Stewart,

Aggregate's general counsel, and the two decided to transfer fifty-nine drivers while the charge was pending. The upshot is that Aggregate's decision to transfer fifty-nine drivers was not unilateral. Things shook out the way they did because the parties reached an agreement pending resolution of this case. The results of that agreement cannot be held against the company.

If the parties had not reached an agreement, Aggregate would likely have transferred whoever agreed to cross the picket line, hired the rest of the drivers from other sources, and then fired some of the surplus construction drivers to bring the unit to the size necessary to do the remaining construction work. But the record does not show how many drivers this would have left in the unit.[5] At one point, Aggregate indicated that it needed twenty to thirty trucks to do material hauling work. Whether that would have been enough to change the bargaining unit is unclear, but it is also irrelevant – this case cannot be decided by characterizing counterfactuals. The record is not developed on this point. It was the Board's job to support its evidentiary conclusions. *See Serramonte Oldsmobile, Inc. v. NLRB*, 86 F.3d 227, 233 (D.C. Cir. 1996). It has not done so here. We cannot see substantial evidence to support the Board's finding that the company seriously weakened the construction bargaining unit by unilaterally transferring most of the drivers out of it.

---

[5] As discussed above, the union objected only to part of the material hauling transfer. *See supra* note 3. It agreed that the company could transfer trucks to haul aggregate to cement plants, but not that it could transfer trucks to haul aggregate to construction sites. Even if we knew how many trucks the company would have transferred, it is anyone's guess how many of them would have been devoted to construction hauling.

This brings us to the company's proposal to the construction drivers at the October 1 meeting and in the letter that followed. The company went to its drivers only after the union refused to fulfill the company's dispatch order. If the company's dispatch order was proper, then the union's refusal to fill it violated the Ready-Mix Agreement and under the terms of that agreement, Aggregate had the right to hire whomever it wanted, including its construction drivers. On the other hand, if the dispatch order was an unlawful unilateral change, then the union had a right to refuse to fill it. Determining whether the company had the right to issue the dispatch order requires deciding whether the union was obligated to bargain about the issue in the first place. Relying on the company's proposal to its drivers, as the Board did, thus begs the question. The propriety of that proposal depends on how one characterizes the company's original plan, not the other way around. If the original plan was merely to transfer work and the company bargained to impasse about it, then everything that Aggregate did was proper. Conversely, if the plan constituted a change in the bargaining unit, then the dispatch order was an unlawful unilateral change and everything the company did after that point was just doubling down on a bad idea.

The crucial action here is the company's initial proposal to the union, and the key date is July 9, 2010. This is the date of the meeting between company representative Sean Stewart and union representative Wayne Dey. The Board claims that during that meeting, Stewart told Dey that Aggregate "was 'going to move' the drivers who hauled aggregate from Sloan Quarry to construction sites from coverage under the Construction Agreement to coverage under the Ready-Mix Agreement." 359 N.L.R.B. No. 156, at 2 (Board opinion). But that description of events conflates two distinct proposals. First, Stewart told Dey that the company planned to move material hauling *work* from the Construction Agreement to the Ready-Mix Agreement.

Second, Stewart asked Dey whether it would be possible to use the same drivers, who at that time worked under the Construction Agreement, to do the newly transferred work under the Ready-Mix Agreement. Dey gave different answers to each of these plans. The substance of those answers are significant, as we will explain in a moment. For now, it is enough to note that Dey recognized that he was dealing with two discrete proposals.

At most one of those two proposals could be considered a change in the bargaining unit. Even if the union were free to refuse to bargain about transferring the drivers, it still had a duty to bargain over any aspects of the proposal that were mandatory subjects of bargaining. The company's plan to move material hauling work from the Construction Agreement to the Ready-Mix Agreement was a straightforward work transfer. Indeed, once it is distinguished from the separate plan to transfer drivers, it is hard to see how it could be anything else.

In some cases, distinguishing between work transfers and bargaining unit changes is difficult. This is not such a case. Most of the thorny disputes about this issue arise when a bargaining unit is defined in terms of the work it performs. If a bargaining unit is so defined, a work transfer changes the scope of the unit by definition, and "the same facts can be put in either category with equal plausibility . . .." *Hill-Rom Co., Inc. v. NLRB,* 957 F.2d 454, 460 (7th Cir. 1992) (Easterbrook, J., dissenting).

But when the bargaining unit is not defined in terms of the work the employees perform, the distinction is not so evanescent. In that situation, transferring work out of the unit does not necessarily change the unit's scope, and characterizing an employer's action is more straightforward. That is what we have here. The Board found that both the Construction

Agreement and the Ready-Mix Agreement defined their bargaining units in terms of "job classifications," not in terms of the work the unit employees perform. 359 N.L.R.B. No. 156, at 3. And none of those job classifications unambiguously covers material hauling work.[6]

The Board recognized that this case does not present the "particularly" difficult situation in which a bargaining unit is defined in terms of the work it does. Nevertheless, the Board insisted that even when a bargaining unit is not initially so defined, "once a specific job has been included within a bargaining unit, the employer cannot remove it without the consent of the union or action by the Board." 359 N.L.R.B. No. 156, at 3 (Board opinion) (citing *Wackenhut Corp.*, 345 N.L.R.B. 850, 852 (2005)); *see also* 361 N.L.R.B. No. 80, at 1 n.1 (Oct. 31, 2014). According to the Board, this means that because Aggregate assigned material hauling work to the construction drivers, the transfer necessarily changed the scope

---

[6] Aggregate argues that industry practice makes clear that the Ready-Mix classification "Transport Drivers (S[and] & G[ravel])" includes material haul drivers. The testimony of an executive from a competing Ready-Mix company supports this assertion. And in at least one place the Construction Agreement seems to suggest that it does not cover hauling to construction sites. Article 4 Section 8 of the agreement states that "[l]egitimate vendors of materials" may deliver materials to supply piles at construction sites, but drivers "covered under this Agreement" must take those materials from the supply piles to work sites. Joint Appendix 302. However, the Construction Agreement also states that "employees covered by this Agreement shall continue to be assigned all work which they have historically or customarily been assigned by the Employer to perform." Joint Appendix 298-99. And it includes job classifications for "[d]rivers of dump trucks" and "[t]ransport [d]rivers." Joint Appendix 332-33. In short, either agreement could plausibly cover material hauling work.

of the construction unit, and the company could not make the change without the union's consent.

That cannot be right. If an employer had to obtain the union's consent every time it removed a work assignment from the unit where it "has been included," then every work transfer would require union consent, and the Board's line of cases distinguishing between work transfers and bargaining unit changes would be meaningless. 359 N.L.R.B. No. 156, at 3 (Board opinion). Unsurprisingly, the precedents the Board cited – *Wackenhut Corp.*, 345 N.L.R.B. 850 (2005); *Holy Cross Hospital*, 319 N.L.R.B. 1361 (1995); and *Hampton House*, 317 N.L.R.B. 1005 (1995) – do not support this conclusion. In both *Wackenhut* and *Holy Cross*, the employers did not simply move work between positions in different units; they effectively eliminated the position that had initially done the work. In *Hampton House*, the Board discussed the issue only as background, and in the end it found that the change in question was a work transfer. 317 N.L.R.B. at 1005, 1008-10. All three Board decisions took this proposition nearly word-for-word from the Seventh Circuit's opinion in *Hill-Rom,* 957 F.2d at 457. But *Hill-Rom* was clear that "modify[ing] th[e] position" means making "unilateral changes in the unit *description*." *Id.* (italics added); *see also Boise Cascade*, 860 F.2d at 475 ("[U]nilateral changes in the unit *description* are unlawful . . .." (italics added)). The next page of the *Hill-Rom* opinion reaffirmed that "assigning work previously performed by unit employees to other employees outside the unit is perfectly consistent with transfer of work . . .." 957 F.2d at 458. In the end, *Hill-Rom* also held that the employer's action at issue – unilaterally eliminating two positions and placing the employees' duties in a new classification outside the unit – was a work transfer rather than a change in the bargaining unit. *Id.* at 455-56, 459.

We therefore find that the company's proposal is best classified as a transfer of work. The Board reached the opposite conclusion only by combining the work transfer proposal with a separate proposal to use the same drivers. But the parties treated the two proposals as distinct, and we do so as well. Considered in isolation, moving material hauling from one agreement to the other did not implicate the scope of either bargaining unit, because the scope of those units did not depend on doing any particular work.

A work transfer is a mandatory subject of bargaining, so the union was obligated to bargain with the company about its proposal. At the July 9 meeting and for several months afterward, the company made overtures to the union, offering to discuss the plan to transfer material hauling work. However, after some initial hesitation, by mid-August the union had decided that it could not agree to the plan. It doggedly maintained that position until the end of September, when Aggregate made the change unilaterally. By stonewalling the company in this way, the union waived its opportunity to bargain. At the very least, if the union's feeble efforts counted as bargaining at all, the two sides quickly reached an impasse. Either way, the company tried to bargain and got nowhere. It therefore had a right to implement its plan unilaterally.

The Board held that even if the company's proposal was a work transfer, the union was not obligated to bargain because the company did not give it any opportunity to do so. *See, e.g.*, *Int'l Ladies' Garment Workers Union, AFL-CIO v. NLRB*, 463 F.2d 907, 919 (D.C. Cir. 1972). Instead, the Board found that at the July 9 meeting, Aggregate merely presented the union with a *fait accompli* rather than a good faith bargaining proposal. *See Pontiac Osteopathic Hosp. & Int'l Union*, 336 N.L.R.B. 1021, 1023 (2001) ("[A] union cannot be held to have waived bargaining over a change that is presented to it as a *fait accompli*

. . ..").  Of course, at that time the company was still months away from putting in its dispatch order, so the *fait* was far from *accompli*.  But the Board believed that a *fait accompli* was still possible because the company had a "fixed intent to transfer the disputed drivers and their work."  359 N.L.R.B. No. 156, at 5 (Board opinion).

In coming to this conclusion, the Board relied heavily on Sean Stewart's statement at the July 9 meeting that the company was "going to move" the material hauling work, not that it was "considering" doing so.  359 N.L.R.B. No. 156, at 5 (Board opinion).  According to the Board, this way of phrasing things "presented the Union with no opportunity for meaningful bargaining."  *Id.*  We doubt that unions are so easily cowed. The National Labor Relations Act requires employers to bargain; it does not require them to be bad at it.  When Aggregate said it was "going to move" the work, it was announcing a bargaining position.  The fact that the company did not hedge its proposal with "what-ifs" and "maybes" does not mean that it was unwilling to negotiate.

The Board's cases addressing this issue have consistently recognized that "where a union receives timely notice that the employer *intends* to change a condition of employment, it must promptly request that the employer bargain over the matter." *Ciba-Geigy Pharm. Div.*, 264 N.L.R.B. 1013, 1017 (1982) (italics added); *Dresser-Rand Co.*, 358 N.L.R.B. 854, 889 (2012), *incorporated by reference in Dresser-Rand Co.*, 362 N.L.R.B. No. 136 (June 26, 2015).  So even if Aggregate expressed an "intention" rather than a "proposal," the union was not excused from requesting bargaining unless the company was

so obstinate that the request would have been futile.[7] *See Regal Cinemas, Inc. v. NLRB*, 317 F.3d 300, 314 (D.C. Cir. 2003).

Aggregate's actions at the July 9 meeting did not amount to the "pronouncement of a final and unqualified decision." *Gratiot Cmty. Hosp. v. NLRB*, 51 F.3d 1255, 1260 (6th Cir. 1995). The reason the parties did not bargain, or plan to bargain, during that meeting was not that the company was dead-set on its proposal. The reason was that at that time, both the company and the union believed that the union's previous administration had already agreed to the plan. In their minds, the bargaining about whether to transfer material hauling work to the Ready-Mix Agreement was already over and done.

---

[7] The Board's original decision relied on a case stating that "if the notice is too short a time before implementation, or [if] the employer has no intention of changing its mind, then the notice is nothing more than informing the union of a *fait accompli*." 359 N.L.R.B. No. 156, at 4 (italics added) (citing *Dresser-Rand*, 358 N.L.R.B. at 889). However, when the Board vacated and then reinstated the decision, it explicitly disclaimed reliance on *Dresser-Rand*. 361 N.L.R.B. No. 80, at 1. It was right to do so. In every other case invoking this passage, the focus has been on the timing and method of the notice, not on the employer's subjective intentions. In *Dresser-Rand* itself, the ALJ relied on the fact that the employer gave the union less than forty-eight hours notice over a weekend. 358 N.L.R.B. at 889-90. In *NLRB v. Centra, Inc.*, 954 F.2d 366 (6th Cir. 1992), the Sixth Circuit found that the employer had "made its decision . . ., implemented its plan secretly, and failed to consult [the union] or to properly inform the union of its intention . . . until it was too late to bargain." *Id.* at 372. And in *Ciba-Geigy*, the Board found a *fait accompli* because the employer never informed the union of its plan; the union found out only when the company sent a letter to all employees announcing the new policy. 264 N.L.R.B. at 1015.

The July 9 meeting was not the union's only opportunity to bargain. In August, after the union rethought its position and announced that it was objecting to the plan, both sides exchanged correspondence. The union offered to discuss several aspects of Aggregate's reorganization, but it would not budge on the work transfer. Eventually, on September 24, the company issued its dispatch request. The union did not fill the request by the deadline, but still the company offered an olive branch. In response to a suggestion from the union's attorney, Aggregate proposed transition rates for existing drivers so they could gradually step down from the Construction Agreement wages to the Ready-Mix Agreement wages. On September 30, Aggregate offered to bargain over the proposal. The union again refused, and eventually Aggregate made its offer directly to the drivers.

Significantly, the ALJ found that "[Wayne] Dey understood" that this September 30 offer to bargain "would have opened the entire transfer of work issue for discussion." 359 N.L.R.B. No. 156, at 20 (ALJ opinion). The Board gave no reason for rejecting this finding of fact, and we see none. Therefore, we accept that on September 30, the union had an opportunity to bargain about the work transfer and declined to do so.

In short, "in the light of all the circumstances," the union had the "reasonable opportunity" to bargain about the work transfer at least on September 30, and probably as early as July 9. *Rose Arbor Manor*, 242 N.L.R.B. 795, 798 (1979). The union either waived its right to bargain entirely or insisted on its position until the parties reached an impasse. Either way, after bargaining failed the company had the right to unilaterally transfer the work.

Because the company had the right to unilaterally transfer material hauling work, the union acted improperly when it refused to fill the company's dispatch order. Under Article 3 of the Ready-Mix Agreement, Aggregate therefore had the right to hire anyone it wanted, including its own drivers. This means that Aggregate did not engage in unlawful direct dealing when it made its proposal to the construction drivers. The union bargained away its right to avoid such direct dealing when it agreed to allow the company to "procure workers from any source . . . [r]egardless of union affiliation" if the union did not fill a dispatch order. Joint Appendix 360.

We therefore grant the petition for review and deny the application for enforcement of all aspects of the Board's order addressing the company's decision to transfer material hauling work.

There is one collateral matter we need to address. The union filed a second unfair labor practices charge alleging that the company improperly changed the affiliation of two sweeper truck drivers from the Teamsters union to the Laborers union. Such an action is at least a work transfer, if not a change in the bargaining unit, and thus Aggregate was obligated to bargain about it. Aggregate admits that it made this change without consulting or even notifying the Teamsters. The company argues that this was proper because if two unions are engaged in a jurisdictional dispute, an employer may make such a change without consulting the union. *See J.L. Allen Co.*, 199 N.L.R.B. 675, 675-76 (1972). But there was no jurisdictional dispute here. The ALJ credited the testimony of Aggregate's transportation manager, who "denied that the Laborers [had] ever demanded that its members perform [Aggregate's] sweeper driver job duties." 359 N.L.R.B. No. 156, at 23 (ALJ opinion). This credibility determination was reasonable, and it was certainly not "hopelessly incredible." *Capital Cleaning*

*Contractors, Inc. v. NLRB*, 147 F.3d 999, 1004 (D.C. Cir. 1998). The company also engaged in unlawful direct dealing by negotiating with these employees in the absence of a jurisdictional dispute. On these points, we deny the petition for review and grant the application for enforcement.

*So ordered.*