**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2019-NMCA-031**

**Filing Date: February 21, 2019**

**No. A-1-CA-36331**

**COMMUNICATION WORKERS OF
AMERICA, AFL-CIO,**

       Appellant/Cross-Appellee-Petitioner,

v.

**STATE OF NEW MEXICO,**

       Appellee/Cross-Appellant-Respondent.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
Carl J. Butkus, District Judge**

Released for Publication July 9, 2019

Youtz & Valdez, P.C.
Shane Youtz
Stephen Curtice
James A. Montalbano

Albuquerque, NM

Rosenblatt & Gosch, PLLC
Stanley M. Gosch
Greenwood Village, CO

for Appellant

Hector H. Balderas, Attorney General
Lori Chavez, Assistant Attorney General

Santa Fe, NM

Holcomb Law Office
Dina Eileen Holcomb
Albuquerque, NM

for Appellee

## OPINION

**VARGAS, Judge.**

**{1}** This case arises from a prohibited practice complaint filed by the Communications Workers of America, AFL-CIO (the Union) against the State of New Mexico (the State). In its complaint, the Union argued that the State violated the Public Employee Bargaining Act (the PEBA). The Public Employee Labor Relations Board's (the Board) Executive Director, Thomas J. Griego, designated as the hearing officer, found the State violated NMSA 1978, Section 10-7E-19(B) (2003) (prohibiting public employers from interfering with, restraining, or coercing public employees in the exercise of their rights guaranteed under the PEBA) and Section 10-7E-19(F) (prohibiting public employers from refusing to bargain collectively in good faith with the exclusive representative). The Board adopted the Hearing Officer's findings and conclusions, with the exception of those related to the Hearing Officer's finding of a violation of Section 10-7E-19(F). The district court, reviewing the case in its appellate capacity, affirmed the Board's decision that no violation of Section 10-7E-19(F) occurred and reversed the Board's decision insofar as it found a violation of Section 10-7E-19(B). Having granted the Union's petition for a writ of certiorari under Rule 12-505 NMRA, we reverse the district court with instructions to remand to the Board for proceedings consistent with this opinion.

## I. BACKGROUND

**{2}** The State has long maintained a practice whereby a bargaining unit employee who files a grievance may use state-paid time to prepare for and participate in grievance meetings, subject to the discretion of the employee's supervisor. Prior to the enactment of the original version of the Public Employee Bargaining Act (PEBA I), NMSA 1978, §§ 10-7D-1 to -26 (1992, repealed 1999), bargaining unit employees were paid for time spent in grievance meetings. In 1994, following PEBA I's enactment, the Union and State entered into a collective bargaining agreement (CBA). In the 1994 CBA, the parties agreed that:

> The Employer shall allow [u]nion officials and stewards who are employees (hereinafter referred to as "employee officials") to attend, on paid status, meetings agreed to by the parties for purposes of administration of this Agreement, including grievance hearings.
> Employee officials may investigate and process grievances on paid status for reasonable periods of time during their normal working hours. Where an employee official needs to consult with another employee concerning a grievance, both employees shall request permission to do so.

Under this CBA, bargaining unit employees were paid for time spent preparing for and participating in grievance meetings, provided they received approval from their supervisor. The 1994 CBA contained a "zipper clause," which provided:

> This agreement shall be deemed the final and complete agreement between the parties and expresses the entire understanding of the Employer and the Unions. This agreement supersedes any and all previous agreements and all conflicting agency and departmental rules, policies and regulations on the same matters except as otherwise specifically provided herein.
>
> . . . .
>
> The parties acknowledge that during the negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from collective bargaining, and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement. Therefore, the Employer and the Unions, for the life of this Agreement, each voluntarily and unqualifiedly waive the right, and each agree that they shall not be obligated to bargain collectively with respect to any subject or matter referred to or covered in this Agreement. However, the parties continue to have a duty to bargain over any subject or matter which was not within the knowledge or contemplation of the parties at the time they negotiated or signed this Agreement.

{3} Following PEBA I's repeal in 1999, the Union and State operated for four years without a CBA. During this time, bargaining unit employees continued to be paid for time spent preparing for and participating in grievance meetings. In 2004, after the passage of PEBA II, NMSA 1978, §§ 10-7E-1 to -26 (2003, as amended through 2005), the State and the Union entered into a second CBA. The 2004 CBA largely kept the same language regarding paid time for union officials and stewards, adding limitations on union officials' and stewards' use of union time. Under the 2004 CBA, bargaining unit employees continued to be paid for time spent preparing for and participating in grievance meetings, provided they received approval from their supervisor. The 2004 CBA's zipper clause contained similar language to that of the 1994 CBA, though it deleted the waiver language and stated only:

> [F]or the duration of this Agreement, the Employer is not obligated to bargain over Union initiated changes in terms and conditions of employment unless such changes are proposed pursuant to the terms of this Agreement.
>
> [I]n addition to changes initiated pursuant to its Management Rights (Article 5 of this Agreement), the Employer reserves the right to propose other reasonable changes in the terms and conditions of employment of

employees to meet legitimate public service and operating needs, and such changes are subject to negotiation in accordance with the PEBA or any other expedited impasse resolution procedures mutually agreed upon by the parties at the time of such negotiations.

{4}     In 2009, the State and the Union entered into a third CBA, which remains in effect. Article 2 of the CBA, titled "Union Rights," provides:

> Section 3. The Employer shall allow [u]nion [o]fficers and stewards to attend, on paid status (utilizing the union time code in the time and labor reporting system), meetings agreed to by the parties for purposes of administration of this Agreement including grievance meetings within the parameters set forth in this section's succeeding paragraphs.
>
> Each union officer or steward shall be entitled to use union time to investigate and process grievances, which they are authorized to settle, within the agency to which they are employed, for reasonable periods of time without charge to pay or to leave. Union time must be pre-approved and will not be disapproved except for operational reasons.
>
> . . . .
>
> When a union officer or steward desires to consult with another employee concerning a grievance on work time, both employees shall request and obtain prior permission to do so.

Section 3 goes on to provide time and procedural parameters for the grant of union time. Article 2 also defines the terms "union officer" and "steward":

> Union [o]fficer means a classified state employee elected as President, Executive Vice-President, Secretary, Treasurer, Agency Vice-President or as Regional Vice President.
>
> Steward means a classified state employee authorized by the local to administer the [CBA].

Under the 2009 CBA, bargaining unit employees continued to be paid for time spent preparing for and participating in grievance meetings, and were paid with either "[u]nion time" or "paid time," i.e., "regular time." The 2009 CBA retained the language of the 2004 CBA's zipper clause.

{5}     On December 10, 2013, the Union submitted a grievance on behalf of Jacqueline Quintana. Therein, the Union asserted: "[Quintana] requested union time to meet with [the] representative regarding [a prior] grievance. Management denied use of [u]nion time stating the grievant was not a [u]nion [o]fficial or [u]nion [s]teward." Quintana subsequently received an e-mail from manager Leon Lopez, explaining he could not

grant union time because Quintana was not a union official or steward, which "ha[d] been confirmed with [the Office of Human Resources]." He again wrote to Quintana on December 20, 2013, stating that "[m]anagement denied you[r] request for union time because the grievant was not a [u]nion [o]fficial or [u]nion [s]teward." After citing Article 2, Section 3 of the 2009 CBA, Lopez agreed with management's decision, stating, "You are not a [u]nion [o]fficial or a [u]nion [s]teward; therefore, you would not be entitled to the use of union time."

{6}     After the Union continued through the grievance procedure on behalf of Quintana, Behavioral Health Services Division Deputy Director, Karen Meador, wrote to Quintana on January 23, 2014, also upholding management's decision, citing Article 2 of the CBA and stating, "As discussed in the [January 14, 2014] face to face meeting, the Department remains firm in not allowing employees who are neither union stewards nor union officials the opportunity to utilize union time to meet with the Union regarding grievances." The Union's Local 7076 President, Donald Alire, subsequently received a letter dated February 12, 2014, from Human Services Department (HSD) Deputy Cabinet Secretary Charissa Saavedra, reiterating HSD's position that it "has never allowed employees to use union time to meet with a union representative." Contrary to Deputy Secretary Saavedra's claim, Robin Gould, the staff representative for the Union, stated that on February 25, 2014, HSD Human Resources Director Johnna Padilla and Gould "agreed that workers were on paid time."

{7}     After discovering that State agencies were granting bargaining unit employees paid time for time spent in grievance meetings, Sandy Martinez, the State Labor Relations Director, "informed the agencies that [u]nion time only applies to [u]nion officers and stewards and the 'union time' code should only be used for officers and stewards." Director Martinez sent a letter on March 5, 2014, to Alire, quoting Article 2, Section 3 of the CBA and stating:

> Please be advised that the State is taking action to ensure that state agencies comply with the above-referenced language. Accordingly, effective the pay period beginning March 29, 2014[,] paid union time will be applied appropriately for union stewards and officers only. Pursuant to Article 2, § 3, bargaining unit employees are not entitled to paid-time of union time. All past practices with regard to paid union time and paid state time that deviated from the above-referenced language of the CBA are ceased.

The Union did not request to bargain regarding the change referenced in the State's notice, instead choosing to wait six months before filing a prohibited practices complaint. The Union argued the State's March 5, 2014, "notice informed the [Union] of the [State]'s intent to unilaterally rescind the parties' February 25th agreement and unilaterally change terms and conditions for the rest of the bargaining unit." The Union claimed the State's actions violated Section 10-7E-19(A), (B), (D), (F), and (G).

## A.     The Hearing Officer

**{8}** The parties agreed to submit the matter to the Hearing Officer. After reviewing the parties' briefs, affidavits, and exhibits, the Hearing Officer found the terms of the CBA to be ambiguous with regard to payment of bargaining unit employees for time spent preparing for and participating in grievance meetings. Consequently, the Hearing Officer considered the Union's unchallenged evidence of the parties' past practice of paying bargaining unit employees for preparing for and participating in grievance meetings. Indeed, the State's own witness, Labor Relations Administrator Ronald Herrera, stated that he was "aware of at least five (5) instances occurring in 2012 and 2013 in which employees of one (1) agency, the Department of Cultural Affairs, who were not union officers or union stewards, were coded as utilizing union time in the payroll system." Relying on the State's March 5, 2014, letter acknowledgement of a past practice, the affidavit statements of Gould and Alire that the State has engaged in this practice, and six bargaining unit employees' statements and exhibits establishing they were paid either "union time" or "paid time" for time they spent in grievance meetings, the Hearing Officer determined "the past practice of paying employees for preparing and attending their own grievance meetings as either union time or regular work time [was] clearly established." As a result, the Hearing Officer concluded that "the State violated PEBA § 10-7E-19(B) when it unilaterally altered a mandatory subject of bargaining and a longstanding past practice thereby unlawfully restraining and interfering with employees' rights under PEBA."

**{9}** The Hearing Officer also determined that the State violated Section 10-7E-19(F) by unilaterally altering a mandatory subject of bargaining. The Hearing Officer concluded that the Union was relieved of its duty to request bargaining after receiving the March 5, 2014, letter because the State presented the Union with a *fait accompli*, thereby rendering any request to bargain fruitless. The Hearing Officer found the Union had not established a violation of Section 10-7E-19(A), (D), or (G). The State appealed the Hearing Officer's decision to the Board.

## B. The Board

**{10}** The Board convened on April 7, 2015, to hear the State's appeal. After hearing argument from both parties, the Board voted to adopt the Hearing Officer's findings of fact, conclusions of law and rationale "with the exception of those relating to finding a violation of PEBA § 10-7E-19(F)." In explaining its decision to reverse the Hearing Officer's Section 10-7E-19(F) recommendation, the Board stated "that the Union did not adequately explain why it took no action in a six-month period to request bargaining." Both parties appealed the adverse portions of the Board's decision regarding Section 10-7E-19(B) and (F) to the district court.

## C. The District Court

**{11}** The district court reviewed the case in its appellate capacity under Rule 1-074 NMRA. The district court affirmed the Board's finding that no violation of Section 10-7E-19(F) occurred, explaining that the Union was not relieved of its duty to request bargaining because the State provided the Union with sufficient time to do so and had

not implemented the change before notifying the Union. The district court reversed the Board's finding that the State violated Section 10-7E-19(B) because such a finding appeared "inconsistent" with the Board's decision in favor of the State on the Section 10-7E-19(F) issue. Upon the Union's petition, this Court granted certiorari.

## II.    DISCUSSION

**{12}**    The Union argues the State violated Section 10-7E-19(B) and (F) by unilaterally altering a binding past practice regarding the compensation of bargaining unit employees for time spent preparing for and participating in grievance meetings. The State argues in response that there was no binding past practice and, even if there was, the district court correctly determined that the Union was required to request bargaining on the issue and failed to do so. We are therefore asked to determine (1) whether a binding past practice existed that constituted a mandatory subject of bargaining, and (2) whether the State's notice to the Union regarding the change in past practice constituted a *fait accompli*, thereby precluding a finding that the Union's failure to request bargaining served as a waiver of its right to bargain.

### A.    Standard of Review

**{13}**    "Upon a grant of a petition for writ of certiorari under Rule 12-505, this Court conducts the same review of an administrative order as the district court sitting in its appellate capacity, while at the same time determining whether the district court erred in the first appeal." *N.M. Corr. Dep't v. AFSCME, Council 18*, 2018-NMCA-007, ¶ 9, 409 P.3d 983 (internal quotation marks and citation omitted omitted), *cert. denied*, ___-NMCERT-___ (No. S-1-SC-36688, Oct. 24, 2017). "We independently review the entire record of the administrative hearing to determine whether the [Board]'s decision was arbitrary and capricious, not supported by substantial evidence, or otherwise not in accordance with law." *Id*. (internal quotation marks and citation omitted); *see* NMSA 1978, § 10-7E-23(B) (providing the standard of review from the board to the district court). "When reviewing an administrative agency's conclusions of law, we review de novo." *AFSCME, Council 18*, 2018-NMCA-007, ¶ 9 (internal quotation marks and citation omitted). Similarly, "[w]e apply a de novo standard of review to administrative rulings regarding statutory construction." *Id*. (alteration, internal quotation marks, and citation omitted). "In the absence of guidance from our own courts, [our] New Mexico Supreme Court has directed that we should interpret language in the PEBA in the manner that the same language of the National Labor Relations Act has been interpreted." *Cty. of Los Alamos v. Martinez*, 2011-NMCA-027, ¶ 21, 150 N.M. 326, 258 P.3d 1118 (alteration, internal quotation marks, and citation omitted); *see Regents of Univ. of N.M. v. N.M. Fed'n of Teachers*, 1998-NMSC-020, ¶ 18, 125 N.M. 401, 962 P.2d 1236. "We will not disturb the agency's factual findings if supported by substantial evidence, although we engage in a whole record review." *Montano v. N.M. Real Estate Appraiser's Bd.*, 2009-NMCA-009, ¶ 8, 145 N.M. 494, 200 P.3d 544. "Substantial evidence is evidence that a reasonable mind would regard as adequate to support a conclusion." *Id*. ¶ 9 (internal quotation marks and citation omitted).

**B.      Past Practice**

**{14}**    Before discussing the legal impact of the State's March 5, 2014, letter on the parties' claimed past practice regarding "union time" and "paid time," we must first determine whether a past practice existed. The evidence establishing the State's past practice of paying bargaining unit employees to prepare for and participate in grievance meetings, subject to supervisory approval, was unchallenged in the parties' briefs, affidavits, and exhibits submitted to the Hearing Officer. Moreover, Director Martinez acknowledged the past practice in her March 5, 2014, letter stating, "All past practices with regard to paid union time and paid state time . . . are ceased." We therefore defer to the Board's finding that this past practice existed. *See Montano*, 2009-NMCA-009, ¶ 8 ("We will not disturb the agency's factual findings if supported by substantial evidence, although we engage in a whole record review.").

**{15}**    Having determined a past practice existed, we must now consider whether the past practice is binding on the parties notwithstanding the terms of the CBA. The interpretation of a CBA's terms "is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581-82 (1960); *see Cruz-Martinez v. Dep't of Homeland Sec.*, 410 F.3d 1366, 1370 (Fed. Cir. 2005) ("Clear and long-standing practices of the parties—in other words, 'past practices'—can establish terms of the agreement that are as binding as any specific written provision. . . . Generally, factors relevant to a finding of a binding past practice are the duration and consistency of its application and the parties' acquiescence in it."); *Webb v. ABF Freight Sys., Inc.*, 155 F.3d 1230, 1243 (10th Cir. 1998) ("It is well-established that when interpreting the terms of a labor contract, a fact-finder is entitled—and indeed, in some cases required—to look to the past practices of the parties and the 'common law of the shop' to determine the parties' contractual obligations."); *see also* § 10-7E-17(A)(1) (providing that "public employers and exclusive representatives . . . shall bargain in good faith on wages, hours and all other terms and conditions of employment and other issues agreed to by the parties"). As we have previously indicated, the "common law of the shop," i.e., past practices, are used to interpret ambiguous phrases contained in a CBA. *See Alarcon v. Albuquerque Pub. Sch. Bd. of Educ.*, 2018-NMCA-021, ¶ 74, 413 P.3d 507, *cert. denied*, ___-NMCERT-___ (No. S-1-SC-36811, Jan. 23, 2018).

**{16}**    In the present case, the Hearing Officer determined that the CBA was ambiguous regarding the grant of "union time," concluding that the "CBA does not limit the use of 'union time' solely to union officers and stewards—its use is a matter of an employee's supervisor's discretion." The Hearing Officer thus concluded, "[T]here is no express limitation on [the] use [of 'union time'] other than the reasonable exercise of a supervisor's discretion." The Hearing Officer's Report and Recommendation, including his findings of fact, conclusions of law and rationale, were adopted by the Board, except those findings relating to the State's refusal to bargain in good faith. We acknowledge the absence of express language including bargaining unit employees in the list of those

entitled to paid status for grievance meetings. However, in light of the parties' course of dealing throughout the years, and the language in the CBA providing that "both employees shall request and obtain prior permission" in those instances where "a union officer or steward desires to consult with another employee concerning a grievance on work time," we agree with the Board that there is an ambiguity with respect to the type of employees entitled to "union time" for purposes of grievance meetings. *See ConocoPhillips Co. v. Lyons*, 2013-NMSC-009, ¶ 23, 299 P.3d 844 ("In evaluating whether a term is ambiguous, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance." (internal quotation marks and citation omitted)). Moreover, given the CBA's silence on the issue of granting "paid time," i.e., "regular time," for grievance meetings, we conclude the CBA is ambiguous on this matter as well. The State, relying on *E.I. Du Pont & Co., Inc.*, 294 N.L.R.B. 563 (1989), argues that any past practice regarding the grant of "union time" or "paid time" to bargaining unit employees for time preparing for and participating in grievance meetings cannot be considered an implied term of the CBA. *E.I. Du Pont & Co., Inc.* states:

> In distinguishing between terms of the agreement and existing practices, we do not suggest that an agreement can never be read as encompassing past practices that are not specifically written into it. But where . . . the contract contains a clause stating that the written agreement is to be the parties' "entire Agreement" except as to any later supplemental agreements "executed in the same manner" as the main agreement, and the past practices in question are *inconsistent* with the written terms, those practices cannot properly be considered implied terms of the agreement.

*Id.* at 563. However, in this case, we are not faced with a past practice that is *inconsistent* with a CBA's terms—here, the CBA's terms are ambiguous on the subject matter.

**{17}** Nonetheless, the State argues that binding application of the past practice is prohibited by the CBA's zipper clause. This Court adopted the National Labor Relation Board's standard in *Radioear Corp.*, 214 N.L.R.B. 362 (1974), to determine whether a zipper clause eliminated an otherwise binding past practice. *Martinez*, 2011-NMCA-027, ¶¶ 22-25. In *Radioear Corp.*, the National Labor Relations Board concluded:

> [T]he answer to the question of the employer's bargaining obligation does not, in our view, call for a rigid rule, formulated without regard for the bargaining postures, proposals, and agreements of the parties, but rather, more appropriately, should take into consideration such various factors as (a) the precise wording of, and emphasis placed upon, any zipper clause agreed upon; (b) other proposals advanced and accepted or rejected during bargaining; (c) the completeness of the bargaining agreement as an integration[—]hence the applicability or inapplicability of the parol evidence rule; and (d) practices by the same parties, or other parties, under other collective-bargaining agreements.

214 N.L.R.B. at 363 (alteration and internal quotation marks omitted). In the absence of Board findings regarding the zipper clause's effect, if any, on the past practice involved in the present case, we conclude the Board acted arbitrarily and capriciously in determining that the parties' past practice on the issue of granting "union time" or "paid time" to bargaining unit employees is as binding as the written provisions of the CBA, and is therefore a mandatory subject of bargaining. *See Bernalillo Cty. Health Care Corp. v. N.M. Pub. Regulation Comm'n*, 2014-NMSC-008, ¶ 9, 319 P.3d 1284 ("An agency's ruling is arbitrary and capricious if the agency failed to consider an important aspect of the problem[.]" (internal quotation marks and citation omitted)). Given the fact-bound nature of the effect of the zipper clause on the past practice, we remand to the Board to make necessary findings and to determine whether the past practice is binding notwithstanding the CBA's zipper clause. If the Board determines the past practice is binding, the Board must then, consistent with the remainder of this decision, determine whether the State's change of this past practice violated the PEBA.

## C.    Request to Bargain

**{18}**    The Union argues the Board and the district court erred in finding no violation of Section 10-7E-19(F) and that the district court erred in reversing the Board's finding that the State violated the Union's Section 10-7E-19(B) derivative claim.[1] The Union's claims under both Subsection (F) and Subsection (B) of Section 10-7E-19 are based on the State's purported refusal to bargain prior to eliminating the past practice of paying bargaining unit employees for time spent preparing for and participating in grievance meetings, subject to supervisory approval; as such, we address Subsection (F) and Subsection (B) together. Section 10-7E-19(F) provides: "A public employer or his representative shall not . . . refuse to bargain collectively in good faith with the exclusive representative[.]" Section 10-7E-19(B) provides: "A public employer or his representative shall not . . . interfere with, restrain or coerce a public employee in the exercise of a right guaranteed pursuant to the Public Employee Bargaining Act[.]" Section 10-7E-17(A)(1) sets forth the scope of bargaining: "[P]ublic employers and exclusive representatives . . . shall bargain in good faith on wages, hours and all other terms and conditions of employment and other issues agreed to by the parties." Similarly, the National Labor Relations Act (NLRA) prohibits an employer from "refus[ing] to bargain collectively with the representatives of his employees," 29 U.S.C. § 158(a)(5) (2012), and further provides that the duty "to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to . . . confer in good faith with respect to wages, hours, and other terms and conditions of employment[.]" 29 U.S.C. § 158(d).

**{19}**    As the United States Supreme Court has held:

---

[1] To the extent the Union argues an independent, rather than a derivative, basis for its Section 10-7E-19(B) claim, we decline to review this argument as the Union has not cited authority for such a proposition. *See Curry v. Great Nw. Ins. Co.*, 2014-NMCA-031, ¶ 28, 320 P.3d 482 ("Where a party cites no authority to support an argument, we may assume no such authority exists.").

Clearly, the duty [to bargain collectively] may be violated without a general failure of subjective good faith; for there is no occasion to consider the issue of good faith if a party has refused even to negotiate in fact—'to meet and confer'—about any of the mandatory subjects. A refusal to negotiate in fact as to any subject which is within [§] 8(d), and about which the union seeks to negotiate, violates [§] 8(a)(5) though the employer has every desire to reach agreement with the union upon an over-all collective agreement and earnestly and in all good faith bargains to that end. We hold that an employer's unilateral change in conditions of employment under negotiation is similarly a violation of [§] 8(a)(5), for it is a circumvention of the duty to negotiate which frustrates the objectives of [§] 8(a)(5) much as does a flat refusal.

*NLRB v. Katz*, 369 U.S. 736, 743 (1962) (alteration and footnotes omitted); *see Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 198 (1991) ("Sections 8(a)(5) and 8(d) of the NLRA . . . require an employer to bargain in good faith with respect to wages, hours, and other terms and conditions of employment. . . . The Board has determined, with our acceptance, that an employer commits an unfair labor practice if, without bargaining to impasse, it effects a unilateral change of an existing term or condition of employment." (internal quotation marks and citation omitted)).

**{20}** To avoid waiving its right to bargain, a union has an obligation to request bargaining when an employer unilaterally changes a mandatory subject of bargaining. *See Ciba-Geigy Pharm. Div.*, 264 N.L.R.B. 1013, 1017 (1982) ("Despite the fact that an employer may have made a unilateral change in a mandatory subject of bargaining, it is well settled that such action may have been permissible if the union had waived its right to bargain over the particular matter."). A union will not, however, "be held to have waived bargaining over a change that is presented to it as a *fait accompli*." *Dresser-Rand Co. v. NLRB*, 838 F.3d 512, 518 (5th Cir. 2016) (internal quotation marks and citation omitted). We adopt the National Labor Relations Board's interpretation of what constitutes a *fait accompli*: "[I]f the notice is too short a time before implementation or because the employer has no intention of changing its mind, then the notice is nothing more than informing the union of a *fait accompli*." *Ciba-Geigy Pharm. Div.*, 264 N.L.R.B. at 1017. Under this analysis, we glean two methods of establishing a *fait accompli*: timing *or* intent. *See Haddon Craftsmen, Inc.*, 300 N.L.R.B. 789, 790 (1990) (analyzing the union's claim of a *fait accompli* under both the timeliness of the notice and the employer's intent); *accord Aggregate Indus. v. NLRB*, 824 F.3d 1095, 1103-05 (D.C. Cir. 2016); *Gratiot Cmty. Hosp. v. NLRB*, 51 F.3d 1255, 1260 (6th Cir. 1995).

## 1.    The Timing of the State's Notice

**{21}** In this case, the Board's sole explanation for finding no violation of Section 10-7E-19(F) centered on the timing of the State's notice. "To be timely, the notice must be given sufficiently in advance of actual implementation of the change to allow a reasonable opportunity to bargain." *Ciba-Geigy Pharm. Div.*, 264 N.L.R.B. at 1017. Although the Union argues on appeal that the State's notice was untimely, it expressly

waived this argument during the Board hearing. As a result, we will not review this argument on appeal. *See Selmeczki v. N.M. Dep't of Corr.*, 2006-NMCA-024, ¶¶ 23-24, 139 N.M. 122, 129 P.3d 158 (explaining that we "require preservation of issues raised on appeal from an administrative decision[,]" and declining to review an issue waived by a party during an administrative proceeding).

## 2.    The State's Intent

**{22}**    Beyond the timing of the State's notice, the Board did not address whether the State's notice constituted a *fait accompli* because the State had no intention of altering its plans. The language contained in an employer's notice of changes to mandatory subjects of bargaining may be insufficient to establish a *fait accompli* on its own. *See Aggregate Indus.*, 824 F.3d at 1103 (concluding that the employer's notice to the union that it was "going to" enact a policy change was its announcement of a bargaining position, not its unwillingness to negotiate). However, the notice's language, in conjunction with additional evidence of the employer's fixed intent, may serve to establish a *fait accompli. See Mercy Hosp.*, 311 N.L.R.B. 869, 873 (1993) ("The [b]oard looks for objective evidence in determining whether an employer has unlawfully presented a union with a *fait accompli*. Further, an employer's use of positive language in presenting its proposal does not constitute an indication that a request for bargaining would be futile." (internal quotation marks omitted)); *Haddon Craftsmen, Inc.*, 300 N.L.R.B. at 790 (explaining that the record "yields no *objective* evidence that, at this point, the [employer] acted in a manner that relieved the [u]nion of its obligation to request bargaining by, e.g., informing the [u]nion that bargaining would be futile or by implementing the changes before announcing them to the [u]nion" (footnote omitted)).

**{23}**    Significantly, the Board's decision contains no indication that it considered the possibility that the State had already implemented, or was in the process of implementing, its stated shift in policy, so as to warrant a finding that the State had no intention of changing its mind. However, Director Martinez's affidavit sheds some light on this issue:

> 5.    Due to the misinterpretation by State agencies of the application of [u]nion time, I informed the agencies that [u]nion time only applies to [u]nion officers and stewards and the "union time" code should only be used for officers and stewards.
>
> 6.    I also clarified with State agencies that bargaining unit employees do not have a right to meet with a [u]nion officer or steward regarding a grievance on work time, but that an employee must request to be able to do so from the employee's supervisor.
>
> 7.    I sent notice to Donald Alire, CWA Local 7076 President, on March 5, 2014, informing him of the State's action to ensure the agencies were complying with the collective bargaining agreement.

Although Director Martinez's statement does not specify the date she informed the agencies of this policy, her statement nonetheless suggests that the State had implemented, or began implementing, its shift in policy when it sent the March 5, 2014, letter to Alire. Such an inference is further supported by the facts and circumstances of the Quintana grievance, which reflect that, well prior to Director Martinez's March 5, 2014, notice, the State denied Quintana's request for union time to participate in a grievance meeting and later agreed with the Union that "workers were on paid time."

{24} The Board failed to consider the State's intent in determining whether it presented the Union with a *fait accompli*. The Board's decision was therefore arbitrary and capricious, *see Bernalillo Cty. Health Care Corp.*, 2014-NMSC-008, ¶ 9 ("An agency's ruling is arbitrary and capricious if the agency failed to consider an important aspect of the problem[.]" (internal quotation marks and citation omitted)), and we remand for the Board to consider this issue as well.

## III. CONCLUSION

{25} We reverse the district court with instructions to remand to the Board for a determination of whether the CBA's zipper clause eliminated the past practice of paying bargaining unit employees for time spent preparing for and participating in grievance meetings in light of the factors provided in *Radioear*, and, if not, whether the State's actions constituted a *fait accompli* on the basis of the State's intent, thereby excusing the Union from requesting bargaining.

{26} **IT IS SO ORDERED.**

**JULIE J. VARGAS, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Judge**

**JENNIFER L. ATTREP, Judge**